LARRY S. LOIGMAN, PLAINTIFF-RESPONDENT, v. IRWIN I. KIM-
MELMAN, ATTORNEY GENERAL OF THE STATE OF NEW
JERSEY, AND ALEXANDER D. LEHRER, PROSECUTOR OF
MONMOUTH COUNTY, DEFENDANTS-APPELLANTS.

Argued November 4, 1985—Decided February 25, 1986.

*Anne C. Paskow,* Deputy Attorney General, argued the cause for appellants (*Irwin I. Kimmelman,* Attorney General of New Jersey; *Linda K. Calloway,* Deputy Attorney General, on the brief).

*Larry S. Loigman* argued the cause *pro se.*

*Gary H. Schlyen,* Senior Assistant Prosecutor, argued the cause for *amicus curiae* County Prosecutor's Association (*Jo-*

*seph A. Falcone,* Passaic County Prosecutor, President, attorney).

The opinion of the Court was delivered by

O'HERN, J.

In this case we are called upon to balance the citizen's right of access to official information with the government's need for confidentiality in the conduct of law-enforcement investigations. Here, the citizen seeks access to what is described as an Attorney General's audit of the confidential account of the Monmouth County Prosecutor. Such accounts are designed to enable a prosecutor to conduct undercover operations, reward informers, and perform other sensitive law-enforcement functions.

The plaintiff is a practicing attorney of Monmouth County. He had sought information from the Monmouth County Board of Freeholders with respect to disbursements made under the county prosecutor's confidential account and his petty-cash and confiscated-monies accounts. He learned that the Attorney General had conducted a review of the matters. He requested a copy of what is referred to as an audit of the account. The Attorney General declined to turn over the material on the ground that it was a confidential internal investigation, privileged from disclosure. The plaintiff brought suit in the Superior Court under the State's Right to Know Law, *N.J.S.A.* 47:1A–1 to –4, asserting that the document was a public record "required by law to be made, maintained or kept on file." *N.J.S.A.* 47:1A–2. Under the Right to Know Law, any citizen, without any showing of personal or particular interest, has an unqualified right to inspect such documents if they are, in fact, such public records. *Irval Realty Inc. v. Board of Pub. Util. Comm'rs,* 61 *N.J.* 366, 372–73 (1972).

The Attorney General moved to dismiss the plaintiff's complaint on the ground that the record of the confidential investigation of the accounts of the Monmouth County Prosecutor's

office was not one required by law to be maintained or kept on file, and was not, therefore, a "public record" under the statute. At oral argument on the return day of the State's motion, the plaintiff for the first time, and without any papers in support of the argument, asserted a common-law right of access to the materials. The trial court granted the State's motion for judgment on both grounds.

On appeal, the Appellate Division, in an unreported opinion, affirmed the trial court's ruling that the document or documents were not public records required by law to be made, maintained, or kept on file under the Right to Know Law. It reversed the judgment of the trial court, however, with respect to plaintiff's common-law interest in obtaining access to the materials. In view of the fact that plaintiff alleged a common-law right of inspection that was not clearly asserted in the trial court, the Appellate Division concluded that the claim should be first decided by the trial judge. It remanded the matter to that court to determine

whether plaintiff is an appropriately interested party, whether the documents are public records at common law, and, if so, to call for their production to the court for a review *in camera* to ascertain whether all or some portion of the audits should remain confidential as urged by the attorney general or whether all or some part should be made available to plaintiff for his inspection.[1]

The question of whether these records are public records at common law has been amply covered in prior decisions. *See Nero v. Hyland,* 76 *N.J.* 213, 221–22 (1978) (written memorials "made by public officers in the exercise of public functions" are common-law public records even though they may not be public records under Right to Know Law); *Irval Realty, supra,* 61 *N.J.* at 375 (records prepared by State agency are public records at common law even if they are not required by law and

---

[1]The Appellate Division noted that the parties have limited themselves to the so-called confidential fund of the prosecutor and not other accounts, although the initial letter from the Attorney General to plaintiff advised that an audit had been conducted of the "confidential fund, petty cash fund and confiscated monies."

thus not public records within Right to Know statute). The subject needs no further discussion.

We granted the Attorney General's petition to review whether the Appellate Division opinion calls for an automatic *in camera* review at the request of any claimant alleging citizen status, no matter how confidential the material. 101 *N.J.* 253 (1985). We think not, especially in view of the fact that, on a motion for rehearing, the Appellate Division clarified its decision, observing that the trial court "did not decide whether the documents were public records at common law and whether plaintiff has standing. Therefore, unless the trial judge answers these questions affirmatively there will be no *in camera* inspection." In view of the concerns expressed, we granted leave as well to the County Prosecutors' Association to be heard as *amicus curiae*.

I.

In *McClain v. College Hosp.*, 99 *N.J.* 346 (1985), we recently reviewed the citizen's common-law right to gain access to public records. There, we dealt with a patient's right of access to confidential investigative records relating to a licensing board's inquiry into a professional's acts. We described the balancing process that courts must make as being "concretely focused upon the relative interests of the parties in relation to these specific materials." *Id.* at 361. We also described the process as flexible and adaptable to different circumstances and "sensitive to the fact that the requirements of confidentiality are greater in some situations than in others." *Id.* at 362. We summarized it thus:

> As the considerations justifying confidentiality become less relevant, a party asserting a need for the materials will have a lesser burden in showing justification. If the reasons for maintaining confidentiality do not apply at all in a given situation, or apply only to an insignificant degree, the party seeking disclosure should not be required to demonstrate a compelling need. [99 *N.J.* at 362.]

We believe that similar principles apply in this context. *Nero v. Hyland, supra*, 76 *N.J.* 213, does not, as asserted by the

Attorney General, sustain an absolute privilege of secrecy for all such investigatory materials. Rather, we held there that a State Police character investigation of an applicant for a public position is so sensitive that disclosing the materials to the very individual whose qualifications were being canvassed would chill the investigative process. *Id.* at 224. The opinion made clear, however, that there was no fixed rule for determining whether disclosure is appropriate. A court should balance, in each case, the individual's right to the information against the public interest in the confidentiality of the file. *Id.* at 223–24 (quoting *Roviaro v. United States*, 353 *U.S.* 53, 62, 77 *S.Ct.* 623, 628, 1 *L.Ed.*2d 639, 646 (1957)). Since the privilege is not absolute, we must further consider the appropriate standards for disclosure.

## II.

Most of the cases that have discussed the standard for assessing the citizen's interest in access to confidential information have arisen in the context of a private need. *See, e.g., Cashen v. Spann,* 77 *N.J.* 138, 142 (1978) (quoting *State v. Oliver,* 50 *N.J.* 39, 47 (1967)) ("substantial showing of a need" for disclosure of informer's name required in civil action); *River Edge Sav. and Loan Ass'n v. Hyland,* 165 *N.J.Super.* 540, 544–45 (App.Div.), *certif. denied,* 81 *N.J.* 58 (1979) (no "compelling need" shown by plaintiff sufficient to outweigh possible harm of disclosure). Somewhat different but related considerations arise when the citizen seeks access to information to further a public good.

Ordinarily, only an assertion of citizen or taxpayer status is necessary for production of common-law records, subject to a showing of good faith. Justice (then Judge) Jacobs, sitting in the Appellate Division in *Taxpayers Ass'n of Cape May v. City of Cape May,* 2 *N.J.Super.* 27 (1949), after canvassing the common-law precedent, phrased the required showing of citizen need to examine tax records thus:

Their motives are good; they are vitally concerned with the threatened tax increase and are seeking information which may support demands for increased governmental efficiency and affirmative action for the elimination of any existing official abuses; they have incurred considerable expense and have completed a substantial part of their inspection * * *. [*Id.* at 31.]

Thus, if the governmental need in confidentiality is slight or non-existent, citizen-taxpayer status will ordinarily warrant that the matters be disclosed. On the other hand, when the public interest in confidentiality is greater, the citizen's right of access is qualified.

In *Casey v. MacPhail*, 2 *N.J.Super.* 619 (Law Div.1949), Justice Brennan, then a Superior Court judge, after reviewing Justice Jacobs' discussion of the question, allowed the voting lists of the City of Jersey City to be turned over to plaintiff in his capacity as a candidate for public office, since he had a legitimate interest in ascertaining that only those who legitimately have a right to vote in the municipal election should, in fact, vote. There was nothing to show that his interest was improper. *Id.* at 623–24. On the other hand, as to his application to have the information turned over to the police department of the City of Jersey City for investigation—a matter for which the Legislature had specified the circumstances and situations under which the list should be investigated—he concluded that it would not be proper to turn the materials over. *Id.* at 624–25. *See also Red Bank Register, Inc. v. Board of Ed.*, 206 *N.J.Super.* 1 (App.Div.1985) (news agency may have right of access to factual data in reports but further balancing required to disclose evaluative material); *Moore v. Board of Freeholders*, 76 *N.J.Super.* 396, 406–07 (App.Div.), *modified,* 39 *N.J.* 26 (1962) (plaintiffs had sufficient status to inspect and copy general public records of county, but not confidential records of the prosecutor's office).

■■ From the standards and cases outlined above we derive that when reasons for maintaining a high degree of confidentiality in the public records are present, even when the citizen asserts a public interest in the information, more than

citizen's status and good faith are necessary to call for production of the documents. Hence, although the Appellate Division referred to a determination of standing before an *in camera* review would be called for, implicit in the concept is a judicial weighing of that showing of standing against the need for confidentiality before proceeding to an automatic *in camera* review of the materials.

## III.

In evaluating the need for confidentiality of the records, we can inform our common-law principles by drawing upon concepts that have gained acceptance among the many jurisdictions that have codified the substantive standards governing disclosure of public records in comprehensive freedom-of-information acts. We refer to such codes only for the guidance they provide. *McClain, supra,* 99 *N.J.* at 356.

The most analogous provision usually contained in freedom-of-information acts is the exemption for law-enforcement and investigatory information. The federal Freedom of Information Act (FOIA), 5 *U.S.C.* § 552, contains the most frequently-referenced provision. The FOIA exemption is far from absolute; as a result of a 1974 amendment, it now covers

investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation * * * confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel[.] [5 *U.S.C.* § 552(b)(7).]

A second commonly-found exemption is similar to the privilege claimed here. It is the usual exception for inter- or intra-agency memoranda. *See, e.g.,* 5 *U.S.C.* § 552(b)(5). This exception furthers the free and candid exchange of ideas and opinions between and within government agencies. *See EPA v. Mink,* 410 *U.S.* 73, 87–88, 93 *S.Ct.* 827, 836, 35 *L.Ed.*2d 119,

132–33 (1973). Presumably, the audit in question here would be used either by the Attorney General or the prosecutor.

A third ground for exempting the material from disclosure is the general, common-law, qualified privilege, variously referred to as the "official information," "governmental," or "executive" privilege. *Martinelli v. District Court*, 199 *Colo.* 163, 612 *P.*2d 1083, 1088 (1980) (en banc) (citing *Comment*, "Discovery of Government Documents and the Official Information Privilege," 76 *Colum.L.Rev.* 142 (1976)). The privilege is expressed in our Rules and Code of Evidence. *See Evid.R.* 34; *N.J.S.A.* 2A:84A–27 (disclosure of "official information" of the State precluded if found "harmful to the interests of the public").

A final source of guidance is the nascent privilege of self-examination or self-critical analysis. A familiar example is a police department's investigation of a mishap in which one of its officers was involved. The Attorney General's investigation partakes of such a nature. The growing acceptance of this privilege among courts is a recognition that the public interest is furthered by the promotion of internal efforts to analyze problems and correct deficiencies. *Note*, "The Privilege of Self-Critical Analysis," 96 *Harv.L.Rev.* 1083, 1099–1100 (1983); *see also Wylie v. Mills*, 195 *N.J.Super.* 332, 337–38 (Law Div.1984) (privilege prevents disclosure of confidential self-evaluative materials when public interest in promoting such materials outweighs individual's need for disclosure).

■ Each of these privileges concerning access to investigatory material is premised upon the government's need to conduct such affairs with skill, with sensitivity to the privacy interests involved, and in an atmosphere of confidentiality that encourages the utmost candor. That need is made explicit in N.J. Executive Order No. 48 (1968), *reprinted in* 1968 *N.J. Laws* 1718–19, directing that State Police investigative files or their contents are not to be turned over or divulged, absent court or executive order, so that the vital public interest in, among other things, the success of criminal prosecutions and

the protection of potential witnesses and informants may be safeguarded. *Id.* at 1719. Since there is a high degree of need for confidentiality in such materials, more than a showing of good faith and citizen status will be required to overcome the public interest in confidentiality. It does not constitute a clear showing of such public need to say only that there may be something corrupt that should be exposed for the benefit of the public. We must also focus upon any negative effect that disclosure may have upon the public good. After all, it is for the benefit of the public that the Legislature has declared that information of this nature should be confidential in order to conduct the public's business of prosecuting crime. In the Criminal Justice Act of 1970, the Legislature addressed the need for monitoring the conduct of such operations at the county level by providing:

> The Attorney General * * * may conduct periodic evaluations of each county prosecutor's office including audits of funds received and disbursed in the office of each county prosecutor. [*N.J.S.A.* 52:17B–103.]

Determining, then, the appropriate balance of public and private interests calls for an "exquisite weighing process by the trial judge." *Beck v. Bluestein*, 194 *N.J.Super.* 247, 263 (App. Div.1984). Given the legislative determination that such confidential accounts would ordinarily be subjected only to the scrutiny of the Attorney General, a judge must be convinced of a clear showing of advancement of the public interest to warrant disclosure.

## IV

A dilemma faces a court seeking to perform this delicate weighing process in the sensitive area of executive privilege if it calls for an immediate *in camera* review of the documents. That act alone may jeopardize the legitimate interests of the government, or of the parties sought to be protected by the privilege, in the confidentiality of the withheld documents. *Cf. Stein v. Department of Justice & FBI*, 662 *F.*2d 1245, 1255–56 (7th Cir.1981) (*in camera* inspection of confidential documents should not be employed automatically). Some of the informa-

tion may be so highly confidential that its disclosure to anyone, including a judge, will irreparably hamper an agency's procedures.[2] It is not inconceivable, for example, that defendants before the court, or perhaps even court employees, may be informers in some matters. The identity of other informers may best be left unknown. Some sources may dry up as they learn that their identity will automatically be turned over to court personnel when requested.

For good or ill, society has concluded that, subject to due process of law, undercover police activities involving confidential informants are necessary to counter the organized activities of criminals. Similar needs for encouraging the flow of ideas by keeping the confidences of executive or legislative policy-makers, or protecting the privacy rights of individuals who may be mentioned in certain reports, may necessitate similar results. We therefore agree that a right to automatic *in camera* inspection is not warranted.

Other jurisdictions have solved the dilemma with a two-step process. When faced with what they call a "blanket" or "generic" claim of exemption, as, for example, the exemption available for records compiled for "law-enforcement" purposes, courts have fashioned a set of procedures that require the agencies making the claim to preliminarily classify, describe, and, in some cases, index the materials. *Stein, supra,* 662 *F.*2d at 1253. On the basis of that description the court lays the material against the exemption claimed to determine if the matter can be resolved without an *in camera* viewing. This procedure was formulated in *Vaughn v. Rosen,* 484 *F.*2d 820, 826–28 (D.C.Cir.1973), *cert. denied,* 415 *U.S.* 977, 94 *S.Ct.* 1564, 39 *L.Ed.*2d 873 (1974), from the requirements of *EPA v. Mink, supra,* 410 *U.S.* 73, 93 *S.Ct.* 827, 35 *L.Ed.*2d 119, which provid-

---

[2]*See State v. Boiardo,* 83 *N.J.* 350, 353 (1980) (Shield Law establishes need for protection of press not only against production of confidential material at trial but against "even that limited disclosure that occurs when the court itself examines the material *in camera*").

ed an outline of how a trial court should approach the task of making the factual determination of whether documents sought under FOIA fit within defined exemptions. The solution continues to be effective even after Congress strengthened FOIA in 1974 by limiting the scope of exemptions, and providing for *de novo* review of exemption claims and *in camera* inspection of the subject materials. 5 *U.S.C.* § 552(a)(4)(B). The method's continued effectiveness stems from the Supreme Court's recognition that *in camera* review is discretionary under FOIA and that the act "does not mandate that the documents be individually examined in every case," thus enabling courts to establish an intermediate procedure for dealing with claims of exemption. *NLRB v. Robbins Tire & Rubber Co.*, 437 *U.S.* 214, 224, 98 S.Ct. 2311, 2318, 57 *L.Ed.*2d 159, 167 (1978). While the process is designed to resolve the questions of exemption under FOIA's system of "turnover of right," it can also aid us in examining preliminarily claims of privilege under our state-law balancing process.

To deal with allegations that documents are exempt, federal courts have concluded, in the words of *Vaughn*, that they will "simply no longer accept conclusory and generalized allegations of exemptions * * * but will require a relatively detailed analysis in manageable segments." *Vaughn v. Rosen, supra,* 484 *F.* 2d at 826 (footnote omitted). When faced with a blanket claim of exemption for documents, the federal courts have required specificity, separation, and indexing, the latter to provide manageable parts for judicial disposition. *See id.* at 827, 827 nn. 21 & 22. Such an analysis need not compromise the secret nature of the information and can ordinarily be composed without excessive reference to the actual language of the document. This two-tiered procedure has enabled federal courts to administer the federal Freedom of Information Act in a workable way. Thus, for example, in *Moorefield v. United States Secret Serv.*, 611 *F.*2d 1021 (5th Cir.), *cert. denied*, 449 *U.S.* 909, 101 *S.Ct.* 283, 66 *L.Ed.*2d 139 (1980), with the claimant Moorefield twice convicted for threatening the life of the Presi-

dent, the court was able to determine that, in view of the continuing threat to the President, the file of the on-going Secret Service investigation could be exempted without the individual scrutiny normally given purportedly—exempt documents. *Id.* at 1023–24. Conversely, in *Jenks v. United States Secret Serv.*, 517 *F.Supp.* 307 (S.D.Ohio 1981), the court found that a determination of whether all investigations of the plaintiff with respect to counterfeiting were to be withheld on the generic basis that they constituted investigatory records compiled for law-enforcement purposes could not be made "solely on the basis of defendant's assertion that all of the documents at issue fall into the broad category of 'investigatory records' * * *." *Id.* at 310. That court, finding that it was "impossible * * * to make an informed, responsible and truly *de novo* determination" of whether the documents should be withheld on the basis of a blanket assertion, adopted the *Vaughn* solution, which the court found may eliminate the necessity of conducting an *in camera* review of the documents, and prevents undue disclosure of documents which fit under one or more of the appropriate exemptions. *Id.* at 312. The index or description need not be so transparent that it becomes, as one court feared, "a cure as perilous as the disease." *Kanter v. IRS,* 433 *F.Supp.* 812, 820 (N.D.Ill.1977).

Recognizing, however, that a detailed *Vaughn* index may in some cases enable astute parties to divine with great accuracy the names of confidential informers, sources, and the like, the procedure contemplates, in rare cases, an *in camera* submission of the *Vaughn* index. *See, e.g., Kanter, supra,* 433 *F.Supp.* at 820, 824–25. *Jenks* described an index appropriate for such a case:

 The index shall itemize and summarize in sufficient detail each document or portion of a document for which the exemption is claimed. This shall include information referring to the origin and source of the document, as well as a brief statement of its contents.

 The index shall further justify the claimed exemption by a brief notation of the ground upon which it is believed that disclosure would interfere with enforcement actions.

■ With respect to documents provided by potential witnesses and confidential information, the index shall state with as much specificity as necessary the grounds upon which it is felt that reasonably segregated or edited portions thereof may not be released.

■ The government shall also provide a separate index of all withheld documents deriving from or relating to any unauthorized or illegal investigative activities, or activities which were arguably without legal justification. [*Jenks, supra,* 517 *F.Supp.* at 313 (quoting *Kanter, supra,* 433 *F.Supp.* at 824–25).] [3]

Substantially the same approach was followed by the Michigan Supreme Court, interpreting its state Freedom of Information Act, in evaluating the propriety of a police department's blanket claim of exemption for reports of a homicide investigation. *Evening News Ass'n v. City of Troy,* 417 *Mich.* 481, 491–503, 339 *N.W.*2d 421, 426–32 (1983).

The analysis is similar to that of *State v. Doliner,* 96 *N.J.* 236 (1984). There we emphasized that the focus must always be on "the character of the materials sought to be disclosed." *Id.* at 248. Armed with a qualitative description by the agency, the trial court will be in a position preliminarily to balance the need for confidentiality exhibited by the description of the materials with the citizen's interest in the information and the potential adverse consequences of disclosure. In this determination, the trial court will want to consider whether the demand for inspection is "premised upon a purpose which tends to advance or further a wholesome public interest or a legitimate private interest." *City of St. Matthews v. Voice of St. Matthews, Inc.,* 519 *S.W.*2d 811, 815 (Ky.1974).

■ Therefore, after evaluating the detailed description of the material furnished to it by the Attorney General, and balancing the asserted need for confidentiality gleaned therefrom against the public interest alleged by the plaintiff as well

---

[3]Obviously, the document at issue here does not call for description in such detail as is required for courts and agencies dealing with broad requests for agency data. *See, e.g., FBI v. Abramson,* 456 *U.S.* 615, 102 *S.Ct.* 2054, 72 *L.Ed.* 2d 376 (1982) (involving request for "any and all" information in FBI files concerning eight individuals which was transmitted to the White House over two years).

as the substantiality of his need for the materials to vindicate that public interest, the court shall decide whether an *in camera* inspection is appropriate. The index may suggest findings of public misconduct that will warrant an *in camera* review by the court before its final decision. If the court deems it necessary to view the materials *in camera*, it will thereafter make a final determination as to whether, by further excision or deletion of privileged and confidential materials, it can appropriately order the materials released. In doing so, some of the considerations that may be examined will include: (1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government; (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed; (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure; (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers; (5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and (6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials. *See Martinelli v. District Court, supra,* 199 *Colo.* at 171, 612 *P.*2d at 1089 (quoting *Frankenhauser v. Rizzo,* 59 *F.R.D.* 339, 344 (E.D.Pa.1973), and noting these and other factors in evaluating right of access to police investigative file). Against these and any other relevant factors should be balanced the importance of the information sought to the plaintiff's vindication of the public interest.

Finally, as a point of practicality, an agency's interest in the confidentiality of the materials can be preserved pending an appeal by sealing the descriptive index and, if necessary, the documents themselves for purposes of appellate review.

As noted at the outset, we are in the position of having to resolve a dispute between a citizen and another branch of

government. Rather than involving courts in balancing the interests involved, the better policy may be that of comprehensive freedom-of-information acts that give citizens an unqualified right of access to public records, subject to defined exemptions, without a showing of need. For now we must resolve the matter in accordance with existing precedent and policy.

As modified, the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.