665 A.2d 798

MARIA SZCZECH AND GARY L. GOLDBERG, INDIVIDUALLY AND AS DEMOCRATIC CANDIDATES FOR OCEAN COUNTY FREEHOLDER, PLAINTIFFS, v. DANIEL J. CARLUCCIO, OCEAN COUNTY PROSECUTOR, COUNTY OF OCEAN AND THE OCEAN COUNTY BOARD OF FREEHOLDERS, CAMILLE MUSTO, JOSEPH JULIANO, DEFENDANTS.

Superior Court of New Jersey
Law Division Ocean County

Decided May 17, 1995.

*Edmund P. Glasner* for plaintiffs (*Glasner & Sheehan*, attorneys).

■■■■■■

*John M. Doran,* Assistant Prosecutor, for defendant Daniel J. Carluccio, Ocean County Prosecutor.

*John C. Sahradnik* for defendants, County of Ocean and Ocean County Board of Freeholders (*Berry, Kagan & Sahradnik,* attorneys).

*Steven P. Russo,* for defendant Camille Musto.

Joseph Juliano, defendant, not appearing.

SERPENTELLI, A.J.S.C.

This case involves a novel issue concerning citizen access to documents pursuant to the Right to Know Law, *N.J.S.A.* 47:1A–1 to 4, and the New Jersey common law. Under what circumstances, if any, may a citizen require the county prosecutor to disclose the contents of criminal investigation files?

In May 1993, the Ocean County Prosecutor's Office was advised of an auditor's report indicating that proceeds were missing from the operation of a county-owned facility known as the Forge Pond Golf Course (Forge Pond). The Prosecutor was notified that two county employees, Camille Musto and Joseph Juliano, had been confronted with the audit findings. He was told that they were under investigation and had been suspended. Musto was the cashier at Forge Pond. Juliano was the manager of county golf operations.

On January 4, 1994, Musto entered a not guilty plea to an accusation charging her with the theft of $7,500. She applied for enrollment in the Pretrial Intervention Program (PTI) pursuant to *R.* 3:28. She resigned her position, waived all rights and entitlements of her employment and agreed to make full restitution.

Musto was admitted to PTI on February 22 for a three-year term. An order of postponement was signed by this court. She remains in PTI to this date. If she successfully completes the program, the charges against her will be dismissed on February 22, 1997.

The Prosecutor's investigation apparently failed to develop sufficient evidence against Juliano to support criminal charges. However, Juliano's attorney offered to have his client resign his position, relinquish any employee benefits and make a payment of $20,000 for losses suffered by the county. The proposal was accepted and no criminal charges were brought against Juliano.

On January 4, 1994, the Prosecutor and a Freeholder held a joint news conference regarding the Forge Pond investigation. Both made public statements as to the results. The conference was widely reported in the media. On September 16, over nine months after the outcome of the investigation was revealed, plaintiff Szczech sought to review the Prosecutor's files concerning the probe. Plaintiff Goldberg subsequently made a similar request. Neither sought a specific document but, rather, wanted the unlimited opportunity to review all files.

When access was denied, plaintiffs filed a complaint on October 11, "individually and as Democratic Candidates for Ocean County Freeholder." An amended complaint was filed on October 13, followed by a second amended complaint on October 24 which joined Musto and Juliano as additional defendants.

As noted, plaintiffs' action originally sought relief under both statutory and common law. At oral argument, plaintiffs' counsel admitted that there was no statutory provision requiring production of the documents. This concession is important in light of the differing relief afforded under statutory and common law. *N.J.S.A.* 47:1A–2 provides:

[A]ll records which are *required by law to be made, maintained or kept on file* by any board, body, agency, department, commission or official of the State or of any political subdivision thereof ... shall, for the purposes of this act, be deemed to be public records.... (emphasis added)

Thus, the statute gives a citizen, without showing a personal particular interest, an unqualified right to inspect public documents if they are, in fact, documents required by law to be made, maintained or kept on file. *Techniscan v. Passaic Valley Water,* 113 *N.J.* 233, 236, 549 *A.*2d 1249 (1988).

By contrast, under the common law, a citizen's right to examine public documents rests upon a showing of some personal or particular interest in the material sought. *Irval Realty, Inc. v. Board of Pub. Util. Comm'rs,* 61 *N.J.* 366, 372, 294 *A.*2d 425 (1972). However, even the existence of such an interest does not give an absolute right to obtain the documents. Rather, the court must engage in a balancing test to determine whether the individual's right to the information outweighs the public's interest in confidentiality of the material. *Nero v. Hyland,* 76 *N.J.* 213, 224, 386 *A.*2d 846 (1978).

The balancing process must be concretely focused upon the relative interests of the parties in relation to the specific information sought. *McClain v. College Hosp.,* 99 *N.J.* 346, 361, 492 *A.*2d 991 (1985). The process should be "flexible and adaptable to different circumstances and sensitive to the fact that the requirements of confidentiality are greater in some situations than in others." *Id.* at 362, 492 *A.*2d 991.

Our Supreme Court has noted that most cases concerning a citizen's right to inspect documents have arisen in the context of a private need. *Loigman v. Kimmelman,* 102 *N.J.* 98, 104, 505 *A.*2d 958 (1986). The Court said that "[s]omewhat different but related considerations arise when the citizen seeks access to information to further a public good." *Ibid.* Plaintiffs allege that those considerations are present in this case.

*Loigman* summarized the basic principles applicable to a request for disclosure of documents based upon a claim that the public would benefit. It held that, ordinarily, only an assertion of citizen status is necessary for the production of common law records, subject to a showing of good faith. *Ibid.* When the governmental need in confidentiality is slight or nonexistent, citizen status will ordinarily warrant disclosure. *Id.* at 105, 505 *A.*2d 958 (citing *Taxpayers Ass'n of Cape May v. City of Cape May,* 2 *N.J.Super.* 27, 31, 64 *A.*2d 453 (App.Div.1949)). However, when the interest in confidentiality is great, the right of access must be qualified. In those circumstances, more than citizen status and

good faith are necessary to require production of documents. *Loigman* stressed that a clear showing of a public need does not exist merely because it is claimed that there may be something corrupt which should be exposed for public benefit. The court must be mindful of any negative effect that disclosure may have upon the public good. *Id.* at 108, 505 *A*.2d 958.

■■■■ Therefore, determining the appropriate balance between public and private interests calls for an "exquisite weighing process by the trial judge." *Beck v. Bluestein,* 194 *N.J.Super.* 247, 263, 476 *A*.2d 842 (App.Div.1984). A judge must be convinced that disclosing the record will advance a public interest.

The Prosecutor has raised numerous arguments to support his position that the negative impact of releasing the documents in this case far outweighs any public benefit. The court need not address all of the reasons advanced. At least for the time being, the provisions of *R.* 3:28 are of primary importance and dispositive of this matter. *R.* 3:28(b) and (c) provide:

(b) Where a defendant charged with a penal or criminal offense has been accepted by the program, the designated judge may, ... postpone all further proceedings against said defendant on such charges for a period not to exceed 6 months.
(c) At the conclusion of such 6–month period, the designated judge shall make one of the following dispositions:
(1) ... dismiss the complaint, indictment or accusation against the defendant, ...; or
(2) ... further postpone all proceedings against such defendant on such charges for an additional period not to exceed 6 months[1] ...; or
(3) ... order the prosecution of the defendant to proceed in the ordinary course....

The Prosecutor argues that the very purpose of the Rule would be undermined if the court permits examination of the investigation files in PTI cases. He stresses that, should Musto not conform to the PTI conditions, she could be returned to the ordinary course of prosecution. Thus, revealing anything presently contained in the file would be at least premature. Further-

[1] By Supreme Court order dated April 24, 1989, this Rule was relaxed to allow for periods of postponement not to exceed 36 months.

more, disclosure could effectively stain a record which, without release, would have been wiped clean by Musto's successful completion of PTI.

Consequently, the Prosecutor contends, unless plaintiffs can produce persuasive reasons that would override the salutary purposes of *R*. 3:28, they should be precluded, at least for now, from scrutinizing the Forge Pond files. Furthermore, it should be noted that they have not demonstrated any feasible way to segregate the file material as between Juliano and Musto. Instead, they want *all* records divulged.

As will be more fully discussed below, plaintiffs readily acknowledge that this action was commenced so that the material sought would be exposed before the impending election. In that way, the public could determine whether the Freeholders seeking election were involved in an effort to cover up their alleged involvement in the decision not to prosecute Musto and Juliano. As plaintiffs' counsel described it, anything less than full disclosure would only reinforce:

[T]he public's concern or notion that whatever happened which relates to the golf course is being swept under the rug and kept from the view of the public ... and we need to return back to the original issue here, and that is what did the Freeholder candidates know or not know about what was going on, and if within the reports involving Ms. Musto there are cross-references to something involving the Freeholders and what was going on with the administration of the golf course, the public has the right to know and that's the balancing test that the court has to engage in.[2]

Essentially, plaintiffs would have this court set aside the mandates of *R*. 3:28 based on the mere contention and undocumented suspicion that something improper occurred in the Forge Pond inquiry. The court finds nothing in the record to suggest that plaintiffs' theory has any validity. In fact, the defendant Freeholders could just as easily claim that there was not a scintilla of evidence supporting the argument, and that the real motivation was to gain a political advantage.

---

[2] Excerpt taken from the tape of October 24, 1994 oral argument.

■ Certainly, in terms of the balancing test in which the court must engage, plaintiffs' bare accusations cannot offset the need to protect the integrity of the PTI process. This conclusion is essential to preserve the principle enunciated in *Loigman* that examination of investigatory material should be premised upon the government's need to conduct its affairs with skill, with sensitivity to the privacy interests involved, and in an atmosphere of confidentiality that encourages the utmost candor. *Loigman, supra,* 102 *N.J.* at 107, 505 *A.*2d 958. In this setting, the public's interest in confidentiality specifically created by *R.* 3:28 must outweigh plaintiffs' narrow purpose of gaining some speculative political advantage through a fishing expedition. *Nero,* 76 *N.J.* at 224, 386 *A.*2d 846.

■ While the court finds the PTI Rule dispositive, plaintiffs' motive in pursuing this litigation deserves some discussion. The decisions cited above emphasize that, among other conditions, any action for disclosure pursued under the common law requires the plaintiff to proceed in *good faith.* When this action was commenced in September 1994, plaintiffs were candidates for public office. All three complaints designate them both "individually and as Democratic Candidates for Ocean County Freeholder." Furthermore, their initial complaint was brought over nine months after the investigation results were revealed.

Plaintiffs action was timed to fall squarely amid the heat preceding the November 8 election so that their Order to Show Cause would receive the broadest media exposure. Indeed, plaintiffs do not argue with the court's characterization of their purposes. During oral argument on October 24, 1994, just 15 days before the election, plaintiffs' counsel conceded at least four times that his clients' motives were political. In fact, he was so conscious of the issue that he attempted to preempt the court's question, as evidenced by the following exchange:

Counsel: Judge, if you're going to ask me and I think your question is (sic) this political, the answer is yes, absolutely. I don't deny it for the moment, neither would my clients. But I would point out that it is the public's right to know as to what happened, and again, your Honor, my clients are not going to be the ones who

are going to make the determination as to what happened. It's going to be the general public when they cast that vote on November 8th.

Court: But their motive is political?

Counsel: Absolutely, your Honor, and it's on behalf of the public, that the public has a right to know, just as they [apparently referring to the plaintiffs] have the right to know, and ... I knew this question was coming, your Honor.[3]

In essence, plaintiffs suggest that, even though the court is being used for a specific political advantage, the action can be justified because the public might somehow benefit by the release of the records. However, plaintiffs' evident incentive was to force the release of documents involving a controversial political issue in the hope that the information would somehow influence the impending election. While they can mask their effort in the guise of serving the public good, it is highly likely that, but for the imminent election, this suit would have never been filed. In the court's view, there is a need to protect against misusing the judicial process for this purpose. Furthermore, the Right to Know Law was not intended to serve as a mechanism to foster a candidate's political aspirations.

While our cases have frequently referred to "good faith" as a prerequisite to procuring documents, the import of that term has not been explored because the disputes have always been resolved on other grounds. Here too, plaintiffs' motives are not controlling, since the PTI issue alone is a sufficient basis to conclude the controversy. However, this is the clearest factual pattern the court has yet found in which the issue of good faith could have served as sufficient grounds to deny inspection of the requested documents.

Finally, this case may highlight the need to clarify the circumstances under which a citizen, acting in good faith, would have a right to obtain investigatory files from law enforcement agencies. At oral argument, the Prosecutor represented that, in many instances, he voluntarily releases investigatory files. In fact, it was suggested that upon the completion of Musto's PTI, the

---

[3] Excerpt taken from the tape of October 24, 1994 oral argument.

records might be made available upon request. Yet, the absence of a statewide policy creates uncertainty regarding both the obligation of law enforcement agencies to honor such requests and the citizens' right to expect disclosure. It is to be noted that, under federal law, the Freedom of Information Act and Privacy Act have confronted the question of the availability of law enforcement agency files. 5 *U.S.C.A.* § 552(b)(7); 5 *U.S.C.A.* § 552a(j)(2). In our State, the matter could be addressed by statute, resolution of either or both houses of the Legislature, or executive order of the Governor. *N.J.S.A.* 47:1A–2. In the interim, our courts will be compelled to evaluate requests on a case-by-case basis.

Plaintiffs' complaint is dismissed.