Reversed and remanded. We do not retain jurisdiction.

935 A.2d 815

TED M. ROSENBERG, PLAINTIFF–APPELLANT, AND GEORGE E. NORCROSS, III, MARK NEISSER, HENRY CHUDZINSKI, R. LOUIS GALLAGHER, II, JCA ASSOCIATES, INC., PHILADEL-PHIA NEWSPAPERS, INC., NEWARK MORNING LEDGER COMPANY, NEW YORK TIMES COMPANY, RECORD OF BER-GEN COUNTY, BURLINGTON COUNTY TIMES, AND COURI-ER–POST OF CHERRY HILL, PLAINTIFFS/INTERVENORS, v. STATE OF NEW JERSEY DEPARTMENT OF LAW AND PUB-LIC SAFETY, DIVISION OF CRIMINAL JUSTICE, AND STATE OF NEW JERSEY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued October 29, 2007—Decided November 30, 2007.

566

Before Judges LINTNER, GRAVES and SABATINO.

*Ted M. Rosenberg,* appellant, argued the cause pro se.

*Lisa Sarnoff Gochman,* Deputy Attorney General, argued the cause for respondents (*Anne Milgram,* Attorney General, attorney; *Ms. Gochman,* of counsel and on the brief).

The opinion of the court was delivered by

LINTNER, P.J.A.D.

On August 28, 2006, a Law Division judge, following an *in camera* review, denied plaintiff Ted Rosenberg's request, under the common law right to know doctrine, for release of documents comprised of approximately 2000 pages, compiled in connection with a discontinued investigation by the New Jersey Department of Law and Safety, Division of Criminal Justice (DCJ), related to the appointment of the Palmyra Borough Solicitor for the year 2001. An order memorializing the judge's decision was executed on September 12, 2006.

Plaintiff appeals, contending that the judge's decision provided only conclusory reasons, without any specific factual findings referencing the individual records themselves. The State counters, claiming that the judge exercised sound discretion in denying plaintiff's relief. We agree with plaintiff and remand for a more detailed articulation of reasons, focusing on either individual documents or groups of documents designated by Bates number in the privilege log (*Vaughn*[1] Index) filed under seal by the State. The sparse, virtually non-existent, reference to particular documents, along with a conclusory statement of reasons rather than specific factual findings, prevents us from making a meaningful determination whether the judge correctly found, on a document-by-document basis, that the information was privileged and thus protected from disclosure. Because of the voluminous number of documents, we anticipate that the more in-depth review, directed by us, will take a substantial period of time and could result in the

---

[1] *Vaughn v. Rosen,* 484 *F.*2d 820 (D.C.Cir.1973), *cert. denied,* 415 *U.S.* 977, 94 *S.Ct.* 1564, 39 *L.Ed.*2d 873 (1974).

release of documents previously deemed exempt by the Law Division judge. We, therefore, do not retain jurisdiction.

We restate the facts alleged by plaintiff and the extensive procedural history. Plaintiff was appointed Solicitor for the Borough of Palmyra by the then governing body for the year 2000. He ran for the position of Chair of the Burlington County Democratic Party in 2000. One of plaintiff's main supporters, John J. Gural, Jr., a Palmyra councilman, was employed as project manager for JCA Associates, Inc. (JCA), an engineering firm in Moorestown, New Jersey. Plaintiff lost the campaign in a very tight race, 243 to 220 votes. According to plaintiff, JCA was the recipient of large, no-bid contracts with various municipalities, authorities, and entities that were subject to considerable influence from George E. Norcross, the former Chairman of the Camden County Democratic Party.

At the time, Mark Neisser was President and Henry Chudzinski was Director of Business Development at JCA. According to plaintiff, he was notified by Gural in December 2000 that Neisser and Chudzinski were pressuring him to arrange for plaintiff not to be reappointed Solicitor of Palmyra for 2001. On the advice of his lawyer, Gural met with members of the DCJ, with whom he shared recordings of conversations with Neisser and Chudzinski that he secretly taped on his own.

After hearing the tapes, the DCJ began a more formal criminal investigation into the matter. From December 2000 to February 2001, Gural, in cooperation with the DCJ, was outfitted with sophisticated recording devices, which he used to record approximately 330 hours in the course of the investigation. The persons recorded included Neisser, Chudzinski, Norcross, R. Louis Gallagher, the then-Chair of the Burlington County Democratic Party and a municipal prosecutor, and others.

According to plaintiff, the recordings reveal that Gural was threatened with loss of his employment if plaintiff was reappointed and Gural was offered compensation for his help. The covert portion of the DCJ investigation ended in February 2001. Plain-

tiff was reappointed to the Palmyra Solicitor position for that year. Plaintiff claims that rumors began to circulate that the Office of the Attorney General was being improperly influenced by Norcross and, as a result, the Director of the Division of Criminal Justice and her deputies were reassigned. He claims that a leading investigator was also removed.

On January 21, 2003, plaintiff, Gural, and Gural's wife filed a complaint alleging tortious interference, racketeering (extortion and bribery and wire fraud), civil conspiracy, and intentional infliction of emotional distress in the Federal District Court. The federal complaint named JCA, Neisser, Chudzinski, Norcross, and Gallagher as defendants.[2]

According to plaintiff, Neisser and Chudzinski were charged by the DCJ with tax law violations in 2003, but not with any crimes in connection with the appointment of the Solicitor of Palmyra for the year 2001. Plaintiff claims that an initial plea agreement Neisser and Chudzinski entered into with the DCJ was rejected by a Law Division judge. He asserts that a modified plea bargain was eventually approved, wherein the parties pled guilty to certain tax offenses and were immunized from criminal prosecution for offenses relating to the appointment of the Palmyra Solicitor in 2001.

On June 10, 2004, the Federal Bureau of Investigation (FBI) sent a letter to the DCJ, asking to review the recordings taken by Gural to determine if there were any federal law violations. Specifically, the FBI requested "an opportunity to review these conversations and transcripts in their entirety." On July 12, 2004, the DCJ denied the FBI's request, advising that "the tapes ... request[ed] [were] an integral part of an ongoing criminal investigation."

On August 10, 2004, plaintiff and Gural served a subpoena *duces tecum* on the DCJ to produce the Gural tapes in the federal

---

[2] At the time this appeal was filed, the federal case was still pending.

lawsuit. The State filed a notice of motion to intervene in the federal suit for the limited purpose of seeking a stay as to all discovery directed toward it, arguing that the DCJ's criminal investigation was ongoing. Alternatively, the State requested that it be granted an additional ninety days from the entry of the federal court's decision to respond to the subpoena.

None of the parties objected and the federal judge granted the State a limited stay of discovery until January 5, 2005. On December 22, 2004, plaintiff made a written request to the DCJ's Records Custodian under the Open Public Records Act, *N.J.S.A.* 47:1A–1 to –13, for "[a]ny and all recordings and transcripts of such recordings made by the Division of Criminal Justice . . . of conversations between . . . Gural . . . and . . . Chudzinski, . . . [Neisser], . . . Gallagher . . . Norcross, . . . as well as other employees and officers of JCA Associates, Inc." The request was denied under *N.J.S.A.* 47:1A–1.1 on January 4, 2005. Plaintiff responded by modifying his request, seeking access to the tape recordings and transcripts under the common law "right to know" doctrine. The DCJ denied the request on January 18, 2005, asserting that plaintiff failed to show an interest in the records requested and that they were the subject of pending federal and state litigation.

On January 12, 2005, plaintiff filed a verified complaint in lieu of prerogative writs and order to show cause for production of the documents he had requested from the DCJ. Plaintiff sought "[a]ny and all investigative records, documents, or other information made or kept by DCJ relating to any criminal investigations involving the appointment of the Solicitor in Palmyra for the year 2001."

Meanwhile, a status conference was held in the federal court on January 27, 2005. The State requested and was granted an extension of the stay of discovery until February 11, 2005, since the criminal investigation was still open. The federal judge directed the State to give the parties to the federal action an

update as to the status of the criminal investigation by February 11, 2005.

On February 10, 2005, DCJ's criminal investigation into the political corruption in South Jersey, including all matters relating to the appointment of the Palmyra Solicitor for 2001, was officially closed. A hearing in the Law Division on plaintiff's order to show cause in the State case was held on February 14, 2005. Argument was adjourned for approximately ten days.

On February 23, 2005, the federal court judge granted the State's request for a reasonable time period to respond to the plaintiff's federal subpoena. The State was given until April 25, 2005, to produce the materials or take some other action.

The Law Division proceeding resumed on February 25, 2005. The judge granted plaintiff's request for production of the audio tapes in the DCJ's possession and ordered the Office of the Attorney General to transmit "[c]opies of any and all recordings" to plaintiff by 4:00 p.m. on the fifteenth day after February 25, 2005. That deadline for production of the tapes was thereafter extended to March 21, 2005.

When the FBI learned the DCJ had completed its criminal investigation, it renewed its request to see copies of the Gural tapes. On March 16, 2005, the DCJ advised that it would provide the FBI and the U.S. Attorney's Office with access to the criminal investigatory file.

On March 31, 2005, Norcross, Neisser, Chudzinski, Gallagher, and JCA were permitted to intervene in the Law Division action "for the limited purpose of obtaining any tape recordings and transcripts simultaneously with any ordered production of any tape recordings and transcripts to [plaintiff]."

The State prepared a descriptive *Vaughn* index and submitted documents for the Law Division judge to view *in camera*. In partial compliance with the order, the State, on March 31, released tapes of conversations between Norcross and plaintiff since those parties did not object to the release of their tapes. They included

a ninety-two minute audiocassette tape in which Norcross partici-
pated and twenty additional audiocassette recordings of Gur-
al/plaintiff and Gural/Norcross, as well as written transcripts of
those recordings. However, the State sought leave to appeal the
Law Division order to prevent release of the other tapes. On May
12, 2005, we reversed the judge's order and remanded the case for
an *in camera* determination of the DCJ's "claims of need to
protect innocent third parties and criminal investigative methods
and techniques."

In May 2005, plaintiff moved to compel the State to release a
videotape recording of a July 19, 2001, meeting with Norcross, his
attorney, and the DCJ Deputy Director Zarillo. The State initial-
ly denied the existence of the videotape but later revealed that the
videotape had been made but was lost or destroyed. In response,
an investigation was launched by the Office of Governmental
Integrity (OGI). The OGI report concluded that the Nor-
cross/Zarillo meeting had been videotaped. On April 4, 2006, the
Law Division judge issued a letter opinion denying plaintiff's
request for the OGI report, finding that the "circumstances sur-
rounding the taping as well as the circumstances involved in the
loss of the tape," which found its way into the OGI report, were
too "intertwined with the investigative and deliberative process" of
a state agency to be able to be redacted out. Despite that ruling,
the State released the bulk of the tape recordings made by Gural
for the DCJ, as well as the audiotape of the July 19, 2001,
Norcross/Zarillo meeting. Those recordings were also released to
all parties in the federal suit.

On September 9, 2005, plaintiff filed its motion, the subject of
this appeal, for the DCJ to turn over all documents in its criminal
investigatory files relating to the appointment of the Palmyra
Solicitor for 2001. The motion requested the following:

1. Compelling the defendant Division of Criminal Justice ("DCJ") to deliver to
the plaintiff a log of all investigative records, documents, or other information made
or kept by the DCJ relating to any criminal investigation(s) involving the appoint-
ment of the Solicitor in Palmyra for the year 2001.

2.  Compelling the DCJ to release any written statements, audio or video recordings made by any of the following individuals: Henry Chudzinski, Mark Neisser, R. Louis Gallagher, II, or George E. Norcross.

3.  Compelling the DCJ to release to the plaintiff its complete investigatory records, documents, or other information made or kept by DCJ relating to any criminal investigations involving the appointment of the Solicitor in Palmyra for the year 2001.

On December 2, 2005, the State produced a new *Vaughn* index, listing all documents to which it alleged were privileged and entitled to confidentiality under the common law "right to know" doctrine. The same day, the DCJ sent copies of files to plaintiff, for which it did not claim any privacy interest, specifically, plea agreements with William Vukoder, Mark Neisser, and Henry Chudzinski; legal research; and correspondence between plaintiff and the DCJ.

The Law Division judge ordered the State to hand deliver to plaintiff and the intervenors copies of the *Vaughn* index, subject to restrictions regarding dissemination. A supplemental *Vaughn* index was filed by the State on March 7, 2006, listing twenty-two transcripts of Gural recordings that were not in the original index.

On January 24, 2006, Christopher Christie, the U.S. Attorney for the District of New Jersey, issued a letter to Nancy Kaplan, the then Acting Attorney General. Christie criticized the manner in which the investigation into Gural and allegations of unlawful political pressure and bribery was handled from the beginning. He noted that the federal government's request for access to the Gural tapes was denied on three separate occasions. He also noted that it was only after Gural and plaintiff filed a civil suit in federal court that the State turned to the federal government for assistance. According to Christie, "[t]his puts the federal government in the uncomfortable position of reviewing the merits of a case in which we were excluded from the investigative process, and then saddled with the results of a clearly compromised investigation." He concluded, "after having carefully considered the available evidence, the applicable law and the manner in which the state investigation was conducted . . . that it would be inappropriate to initiate a federal prosecution."

According to the State, by the time of the August 9, 2006, Law Division hearing, plaintiff and the intervenors had received, through either the state or federal case, copies of all audio recordings in which plaintiff, Neisser, Chudzinski, Norcross, Gallagher, Harrington, or Furia were participants in the conversations taped by Gural. They had also received redacted copies of the audiotape of the Norcross/Zarillo interview.

On August 9, the Law Division judge heard oral argument on whether the rest of the DCJ's criminal investigatory files should be released. Plaintiff waived his request for production of grand jury documents at that time. The judge determined that he would conduct an *in camera* review of the remaining documents in the *Vaughn* index before making a decision.

On August 28, 2006, the judge issued a letter opinion denying plaintiff's request for the further release of documents. The judge first listed the types of documents that were included in the box of materials submitted by the State. They included e-mails, evidence vouchers, newspaper articles, notes of interviews and telephone calls, Gural recordings, legal memorandums, reports from the DCJ detectives, reports of interviews and personal impressions, transcripts of previously released Gural wired conversations, correspondence between counsel, and numerous pages downloaded from NJPolitics.com. The judge then concluded:

> Based upon my review of all of the above documents consisting of approximately 2,000 pages, I have concluded that none of the documents will be released because of either specific privileges, prior release of "best evidence", personal impressions and strategies, personal observations, and police protocols/practices.

Plaintiff filed his notice of appeal on September 25, 2006. On September 29, 2006, the judge issued an amplification of his opinion, *R.* 2:5–1(b). He made the following findings:

> There is no question in this case that the investigation undertaken by the Attorney General ended after this action was commenced, but before it was heard by the court.
>
> . . . .
>
> Every document reviewed contained, in whole or in part, personal impressions, opinions, or observations of the authors and/or police investigative protocols or techniques, all of which were so intertwined with other factual material as to

render redaction of the former an impossible task if some semblance of meaning were to remain for the unredacted portion of the document or set of documents

In this court's opinion, the release of tapes in this case as well as in the federal action, severely curtails the necessity for disclosure of the materials sought. Even though the Attorney General's office concluded that the investigation warranted no criminal charges, that fact does not render the release of investigative records subject to less scrutiny in the balancing of the public interest in confidentiality against disclosure.

Based upon my *in camera* review of the documents, I am convinced that a clear showing of advancement of the public interest has not been made such as to warrant disclosure. That conclusion results from consideration of the factors enumerated in [*Loigman v. Kimmelman,* 102 *N.J.* 98, 113, 505 A.2d 958 (1986)]:(1) that disclosure of the written material in this case could easily impede the primary functions of the DCJ by discouraging witnesses from reporting actual or potential criminal activities; (2) that such witnesses could be subjected to ridicule and unwarranted legal actions by those whose names and activities were reported; (3) that many of the documents contained self-critical analyses and recommendations for improvised investigative procedures which, if released, will be subjected to a chilling effect; (4) that, as noted, the factual data contained in the material sought is so intertwined with personal observations, impressions and strategies that meaningful redaction is made virtually impossible; and (5) that the investigation by the Attorney General's office was the subject of a report from the Office of Government Integrity that this court also declined to disclose for basically the same reasons that disclosure is deemed improper here.

To release the documents sought by plaintiff would, in this court's opinion, be the functional equivalent of allowing the plaintiff to participate with employees of the Attorney General's office in the actual investigation. Separation of facts from opinions cannot be accomplished in any meaningful way.

On appeal, plaintiff asserts that the judge failed to give a sufficiently detailed analysis of the relative interests of the parties in determining his common law right to access to the remaining government records listed in the *Vaughn* index.

■ Access to public records under the common law is dependent on three requirements: "(1) the records must be common-law public documents; (2) the person seeking access must 'establish an interest in the subject matter of the material'; and (3) the citizen's right to access 'must be balanced against the State's interest in preventing disclosure.'" *Keddie v. Rutgers,* 148 *N.J.* 36, 50, 689 A.2d 702 (1997) (quoting *S. Jersey Publ'g Co. v. N.J. Expressway Auth.,* 124 *N.J.* 478, 487, 591 A.2d 921 (1991); *Higg–A–Rella, Inc. v. Cty. of Essex,* 141 *N.J.* 35, 46, 660 A.2d 1163 (1995)).

The State concedes that the documents in question are public records but contends that plaintiff lacks sufficient interest to obtain access. In a supplemental appellate brief, the State points out that any legitimate interest the plaintiff may have had in the State's investigatory documents has been nullified because the federal court, on March 30, 2007, rejected plaintiff's request for additional discovery and entered summary judgment dismissing the federal complaint. It also argues that the judge did a careful *in camera* inspection and evaluation of the documents in balancing the parties' interest in favor of non-disclosure, thus correctly deciding the third-prong requirement against plaintiff and in favor of the State.

Although the judge did not expressly address the existence of plaintiff's interest, we can infer from his balancing of the parties' interest that he found that plaintiff had an interest in the documents. The second prong requires that a plaintiff

establish an interest in the subject matter of the material.... The interest does not have to be purely personal, but ... "[a]s one citizen or taxpayer out of many, concerned with a public problem or issue, [plaintiff] might demand and be accorded access to public records bearing upon the problem, even though his [or her] individual interest may [be] slight."

[*S. Jersey Publ'g Co., supra,* 124 *N.J.* at 487, 591 *A.*2d 921 (quoting *Irval Realty, Inc. v. Bd. of Pub. Util. Comm'rs,* 61 *N.J.* 366, 372, 294 *A.*2d 425 (1972)) (first and last alterations in original).]

*See also Loigman, supra,* 102 *N.J.* at 112, 505 *A.*2d 958 (Plaintiff must have either "a wholesome public interest or a legitimate private interest." (quotation omitted)). For example, a newspaper has an interest when it seeks " 'to keep a watchful eye on the workings of public agencies.' " *Red Bank Register, Inc. v. Bd. of Educ.,* 206 *N.J.Super.* 1, 9, 501 *A.*2d 985 (App.Div.1985) (quoting *Nixon v. Warner Commc'n, Inc.,* 435 *U.S.* 589, 598, 98 *S.Ct.* 1306, 1312, 55 *L.Ed.*2d 570, 579–80 (1978)). Contrary to the State's argument, plaintiff has shown a personal interest as the DCJ investigation focused on an alleged attempt to directly impact his appointment to a public position. Beyond that, the revelation of the taped conversations and the apparent repercussions they had

on the political process embraced the very type of public issues for which access under the common law is afforded.

■ We also reject the State's contention that the dismissal of the federal lawsuit nullifies any personal interest plaintiff may have had in the documents. The dismissal is relevant to the degree of plaintiff's interest, which becomes important in the third-step balancing test of the analysis. *Higg–A–Rella, supra,* 141 *N.J.* at 47, 660 *A.*2d 1163. Similarly, just as the dismissal of plaintiff's federal lawsuit may affect the degree of plaintiff's interest, the DCJ's closing of the criminal investigation is relevant to a determination of the State's degree of interest in maintaining confidentiality. "Obviously, the need for confidentiality is greater in pending matters than in closed cases." *Keddie, supra,* 148 *N.J.* at 54, 689 *A.*2d 702.

■ We move on to the third-prong requirement of the right to access public documents under the common law right. After establishing the requisite interest in the subject matter, a party "seeking access ... must 'establish that the balance of its interest in disclosure against the public interest in maintaining confidentiality weighs in favor of disclosure.'" *Id.* at 50, 689 *A.*2d 702 (quoting *Home News v. Dep't of Health,* 144 *N.J.* 446, 454, 677 *A.*2d 195 (1996)). "In this balancing process, 'the focus must always be on the character of the materials sought to be disclosed.'" *Techniscan Corp. v. Passaic Valley Water Comm'n,* 113 *N.J.* 233, 237, 549 *A.*2d 1249 (1988) (quoting *Loigman, supra,* 102 *N.J.* at 112, 505 *A.*2d 958).

After reviewing the documents in light of the six *Loigman* criteria, the judge essentially found that disclosure (1) would discourage witnesses from reporting actual or potential criminal activities; (2) would subject witnesses named to ridicule and unwarranted legal actions; (3) would reveal self-critical analyses and recommendations which would result in a chilling effect; (4) of factual data sought could not be separated from personal observations, impressions, and strategies because it is so intertwined so as to make redaction virtually impossible; and (5) of the OGI investi-

gatory proceeding circumscribed plaintiff's individual asserted need for disclosure.

■ Generally, "[i]f there is a basis in the record to do so, we must ... defer to the trial judge's determination." *Shuttleworth v. City of Camden*, 258 *N.J.Super.* 573, 588, 610 *A.*2d 903 (App. Div.), *certif. denied*, 133 *N.J.* 429, 627 *A.*2d 1135 (1992); *see also Hammock v. Hoffmann–LaRoche, Inc.*, 142 *N.J.* 356, 380, 662 *A.*2d 546 (1995) ("The questions whether to seal or unseal documents are addressed to the trial court's discretion."). Except for the OGI investigation, the judge, in rendering his decision, referred generally to all the documents rather than a particular document by Bates number or group of documents for which his review determined that a specific privilege applied. For example, our review of the *Vaughn* index reveals that it listed a multitude of documents that only mention the names of the intervenors and, thus, those documents would not implicate the second *Loigman* factor regarding disclosure of third party names. Reference to documents by Bates number does not disclose any specific information contained in the document.

. ■ A trial judge is required to "examine each document individually and make factual findings with regard to why [a plaintiff's] interest in disclosure is or is not outweighed by [the State's] interest in nondisclosure." *Keddie, supra*, 148 *N.J.* at 54, 689 *A.*2d 702; *see also Hammock, supra*, 142 *N.J.* at 381–82, 662 *A.*2d 546 (dealing with sealing of documents in civil cases concerning health, safety, and consumer fraud and noting, "[t]he need for secrecy must be demonstrated with specificity as to *each document* .... The trial court, or a master appointed for such purpose pursuant to *Rule* 4:41–1 to –5, must examine *each* document individually and make factual findings"). " '[A] trial court is better able than an appellate tribunal to ... balance the parties' interests when that must be done to determine whether there is a common-law right of access.' " *Shuttleworth, supra*, 258 *N.J.Super.* at 588, 610 *A.*2d 903 (quoting *Philadelphia Newspapers, Inc.*

*v. State, Dep't of Law & Pub. Safety,* 232 *N.J.Super.* 458, 466, 557 *A.*2d 688 (App.Div.1989)).

> When a New Jersey trial court reviews documents *in camera,* it must "make specific determinations regarding plaintiff's access to them, including an expression of reasons for the court's rulings." The trial court must examine *each* document individually, and explain as to *each* document deemed privileged why it has so ruled.
>
> [*Seacoast Builders Corp. v. Rutgers,* 358 *N.J.Super.* 524, 542, 818 *A.*2d 455 (App.Div.2003) (quoting *Payton v. N.J. Tpk. Auth.,* 148 *N.J.* 524, 550, 691 *A.*2d 321 (1997)).]

When stating the reasons for nondisclosure, a judge should "state with particularity the facts, without disclosing the secrets sought to be protected, that ... persuade the court to seal the document or continue it under seal." *Hammock, supra,* 142 *N.J.* at 382, 662 *A.*2d 546. However, where a judge is unable to reveal factual findings without disclosing the confidential material sought, the disclosure of those factual findings can be sealed for appellate review, thus permitting a meaningful determination by us whether the judge correctly exercised his or her discretion.[3] *See Shuttleworth, supra,* 258 *N.J.Super.* at 589, 610 *A.*2d 903.

Here, the judge restated, in a conclusory fashion, the five *Loigman* factors he found applied, without referencing particular documents by Bates numbers to which a particular factor applied, or making specific factual findings why the factor applied to the contents of particular documents. We, therefore, remand the matter to the trial court with directions to review anew the documents contained in the *Vaughn* index and render a decision making specific reference to particular documents or group of documents and provide his factual findings, if necessary, in the form of a separate sealed decision. Only then can we effectively review the factual basis of the judge's decision and determine whether he " 'abused [his] discretion after weighing the competing considerations of the balancing test.' " *Shuttleworth, supra,* 258 *N.J.Super.* at 588, 610 *A.*2d 903 (quoting *State v. Milligan,* 71 *N.J.*

---

3 In cases where a judge adopts findings of a master, the master's report itself should contain the required level of detail.

373, 384, 365 *A*.2d 914 (1976)). The documents, *Vaughn* index, and factual findings, i.e., specific reference to the contents of the documents of the renewed *in camera* review, shall remain under seal pending any subsequent appeal. We do not retain jurisdiction.

Remanded.