**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1041-24

NEW JERSEY OFFICE OF
THE PUBLIC DEFENDER,

    Plaintiff-Appellant,

v.

NEW JERSEY DEPARTMENT
OF LAW AND PUBLIC SAFETY,
DIVISION OF CRIMINAL JUSTICE,
OFFICE OF PUBLIC INTEGRITY
& ACCOUNTABILITY, and
RECORDS & IDENTIFICATION
BUREAU in its official
capacity as Records Custodian,

    Defendants-Respondents.

_____

        Argued March 16, 2026 – Decided April 15, 2026

        Before Judges Sabatino, Natali and Walcott-Henderson.

        On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0974-24.

        Ashley Brooks, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti,

Public Defender, attorney; Ashley Brooks, of counsel and on the briefs).

Andrew C. Matlack, Deputy Attorney General, argued the cause for respondents (Jennifer Davenport, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Andrew C. Matlack, on the briefs).

Michael J. Zoller argued the cause for amicus curiae Libertarians for Transparent Government (Pashman Stein Walder Hayden, PC, attorneys; CJ Griffin, on the brief).

PER CURIAM

This litigation concerns a demand under the common law for access to certain Internal Affairs ("IA") documents relating to law enforcement officers in Essex County.

Plaintiff, the New Jersey Office of the Public Defender ("OPD"), appeals from the trial court's dismissal of its complaint against defendants, the New Jersey Department of Law and Public Safety, Division of Criminal Justice, Office of Public Integrity and Accountability, and its Records and Identification Bureau.[1]  In the complaint, the OPD asserted a common law right of access to several years of what are known as "Appendix K" reports (and any predecessor

---

[1]  For simplicity, we will generally refer in this opinion to defendants and the various named units within the Office of the Attorney General, as "the AG," unless otherwise indicated.

A-1041-24

reports) produced by the Essex County Prosecutor's Office ("ECPO") to the AG's Office. As we will describe in more detail, Appendix K reports are summary reports of IA activity produced by law enforcement agencies to their relevant county prosecutors on a quarterly basis, as required by Section 9.10.1 of the AG's current Internal Affairs Policy & Procedures ("IAPP") Manual (rev. 2022).

The OPD presented its access request to the AG after the ECPO had inadvertently posted, online, an unredacted Appendix K report. That report contained some identifying information relating to officers and complainants that is supposed to be kept confidential under the Supreme Court's opinion in Rivera v. Union Cnty Prosecutor's Off., 250 N.J. 124 (2022) as well as the IAPP Manual.

In this case, the OPD has sought the disclosure of additional Essex County Appendix K reports for several reasons. The reports may contain IA disciplinary facts that public defenders within the OPD or OPD-designated defense counsel might be able to use to impeach testifying police officers in trials and hearings, or to obtain additional discovery. Additionally, the OPD seeks the reports because they may reveal systemic information about policing that the OPD may be able to utilize in advocating public policy and informing public discourse.

3

The trial court rejected the OPD's request for access to the Appendix K documents. Among other things, the trial court perceived the request was circumventing case-specific criminal discovery rules and the criteria and procedures for obtaining IA information that the Supreme Court prescribed in State v. Higgs, 253 N.J. 333 (2023).

The OPD, joined by amicus curiae Libertarians for Transparent Government, appeals the trial court's decision.

As explained in this opinion, we vacate the court's decision insofar as it relied on Higgs as a justification to deny the OPD access to the Appendix K information. The IA information sought here under the common law could be less detailed and more cursory compared to the more extensive information that criminal defense counsel might be able to obtain in individual cases through the criminal discovery rules under Higgs. The OPD should not have any lesser right to access IA information than that which members of the general public and other requestors are entitled to under the common law.

The matter is remanded to the trial court to reconsider the issues without reliance on Higgs. On remand, the court shall reexamine whether the Appendix K documents, or portions of them, should be released, with appropriate redactions. Related to that analysis, on remand the court should clarify and

A-1041-24

address various factual issues that have been asserted by the parties on appeal relating to the types of information that would be available in a disclosed Appendix K.

I.

A.

Before we describe the facts and procedural history of this case, we provide some background about the development of the relevant law and the common law access principles relating to IA documents.

"New Jersey law recognizes two distinct procedures by which individuals and entities may seek an order compelling the disclosure of public records." Gannett Satellite Info. Network, LLC v. Twp. of Neptune, 254 N.J. 242, 248 (2023). First, there is the process provided under the Open Public Records Act ("OPRA"), N.J.S.A. 47:1A-1 to – 13. Gannett Satellite Info. Network, 254 N.J. at 248. Second, another "cause of action available to a requestor seeking access to public records is a claim pursuant to the common law, in which the requestor is not limited to the categories of information subject to disclosure under OPRA." Id. at 249.

The common law right of access is potentially broader than the statutory right of access under OPRA, as the common law may enable access to any public

A-1041-24

record, defined as any written memorial made by a public officer who was authorized by law to make it.  Id. at 256-57.  On the other hand, "the right to access common law records is a qualified one," and "the showing a requestor must make to gain access is greater than that required under OPRA."  N.J. Media Grp., Inc. v. Bergen Cnty. Prosecutor's Off., 447 N.J. Super. 182, 210 (App. Div. 2016) (internal citations omitted).  "In a common law action for disclosure of public records, a court weighs the requestor's interest in the information against countervailing concerns such as privacy and public safety, and undertakes a careful balancing of factors."  Gannett Satellite Info. Network, 254 N.J. at 249.

The present case involves a claim for the production of IA reports solely under the common law right of access.  Relevant to that claim, in recent years, New Jersey has experienced a major shift in the required production of IA reports, with the AG issuing a revised version of the IAPP Manual every year between 2019 and 2022, and the Supreme Court having addressed the issue in several cases.  We briefly trace that history.

The 2020 AG Directives

In 2020, the AG issued two law enforcement directives, Off. of the Att'y Gen., Law Enf't Directive No. 2020-5, Directive Requiring Public Disclosure of the Identities of Officers Who Commit Serious Disciplinary Violations (June 15,

2020), and Off. of the Att'y Gen., Law Enf't Directive No. 2020-6, <u>Directive Requiring Public Disclosure of the Identities of Department's Officers Who Committed Serious Disciplinary Violations Since 2000</u> (June 15, 2020). These directives, as well as Section 9.11.2 of the <u>2020 IAPP Manual</u>, ordered that, on a prospective basis, all law enforcement agencies had to publish the names of officers found to have committed disciplinary violations that resulted in the imposition of what is termed "major discipline" in their annual reports to the public. <u>Ibid.</u>

In addition, with respect to historical information about major discipline, Law Enf't Directive No. 2020-5 permitted local and county law enforcement agencies to release new incidences of major discipline whereas Law Enf't Directive No. 2020-6 required that the State Police, Division of Criminal Justice, and the Juvenile Justice Commission release information related to past major discipline that had taken place over the past twenty years.

The 2020 Directives "mark[ed] a sharp change in practice," because "[p]reviously, the Attorney General fought to shield the identities of law enforcement officers disciplined for serious misconduct." <u>In re Att'y Gen. Directives</u>, 246 N.J. 462, 472 (2021). In the litigation that followed, the Supreme Court held that "the Attorney General had the authority to issue the

Directives," and the Directives were not arbitrary, capricious, or unreasonable. Id. at 472-73, 489-96.

The Court in In re Att'y Gen. Directives perceived no legal impediment to the prospective release of information, such that "[g]oing forward, officers can expect that their names will be disclosed if they commit acts that result in major discipline." Id. at 473, 505. However, with respect to historical information, the Court ruled that hearings would be necessary, in order to determine whether the doctrine of promissory estoppel applied to prevent the release of the names of disciplined officers who had been individually promised that their identities would not be released. Id. at 473-74, 497-506.

In response to the Supreme Court's decision, the AG issued Off. of the Att'y Gen., Law Enf't Directive No. 2021-6, Directive Regarding Public Disclosure of the Identities of Officers Who Commit Serious Disciplinary Violations (June 9, 2021), and a revised 2021 IAPP Manual.

Rivera

The following year, in 2022, the Court decided Rivera, 250 N.J. at 135, a case in which the plaintiff requestor asserted both a statutory and a common law right of access to IA records about a former police director who was found to have engaged in racist and sexist behavior while in office. The Court held in

Rivera that OPRA does not provide access to internal affairs reports. Id. at 139-43. However, the Court further held that IA reports constitute public records under the common law right of access, id. at 143-44, and they are subject to the common law balancing test for disclosure. Id. at 144. When applying that balancing test, the core questions presented are whether (a) "the person seeking access to the record [has] establish[ed] an interest in the subject matter of the material", and (b) whether that person's interest outweighs "the State's interest in preventing disclosure." Ibid. (quoting N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541, 578 (2017)).

In Rivera, the Court identified six factors for courts to consider in connection with the State's interest in preventing disclosure, as follows:

> (1) the extent to which disclosure will impede agency functions by discouraging citizens from providing information to the government;
>
> (2) the effect disclosure may have upon persons who have given such information, and whether they did so in reliance that their identities would not be disclosed;
>
> (3) the extent to which agency self-evaluation, program improvement, or other decisionmaking will be chilled by disclosure;
>
> (4) the degree to which the information sought includes factual data as opposed to evaluative reports of policymakers;

9

(5) whether any findings of public misconduct have been insufficiently corrected by remedial measures instituted by the investigative agency; and

(6) whether any agency disciplinary or investigatory proceedings have arisen that may circumscribe the individual's asserted need for the materials.

[Id. at 144 (quoting Loigman v. Kimmelman, 102 N.J. 113 (1986).]

As for IA records specifically, the Court noted in Rivera that confidentiality can be particularly important in IA investigations "to encourage witnesses to come forward and cooperate; to protect personal information about witnesses, victims, the subject matter of an investigation, and others; and to avoid impairing the internal affairs process, among other reasons." Id. at 147. On the other hand, "[i]n general, the public has an interest in the disclosure of internal affairs reports in order to hold officers accountable, to deter misconduct, to assess whether the internal affairs process is working properly, and to foster trust in law enforcement." Ibid.

In addition, Rivera recognized that "[t]he public interest in transparency may be heightened in certain situations depending on a number of considerations," id. at 147-48, including the following:

(1) the nature and seriousness of the misconduct. Serious misconduct gives rise to a greater interest in disclosure. For example, misconduct that involves the

use of excessive or deadly force, discrimination or bias, domestic or sexual violence, concealment or fabrication of evidence or reports, criminal behavior, or abuse of the public trust can all erode confidence in law enforcement and weigh in favor of public disclosure;

(2) whether the alleged misconduct was substantiated. Unsubstantiated or frivolous allegations of misconduct present a less compelling basis for disclosure;

(3) the nature of the discipline imposed. Investigations that result in more serious discipline, like an officer's termination, resignation, reduction in rank, or suspension for a substantial period of time, favor disclosure. See In re Att'y Gen. Directives, 246 N.J. at 485;

(4) the nature of the official's position. Wrongdoing by high-level officials can impair the work of the department as a whole, including the functioning of the internal affairs process; and

(5) the individual's record of misconduct. The public's interest in disclosure extends to all officers—regardless of rank—whose serious or repeated misconduct may pose a danger to the public.

[Id. at 148 (citation reformatted) (emphasis added).]

As to all five of these above considerations, the Court noted in Rivera that "transparency can expose problems that need to be addressed or reassure the public about police conduct." Ibid. However, the Court did "not rely on whether an allegation has already been the subject of public interest as part of the balancing process." Ibid. Rather, the Court stated: "Official statements or leaks

11

that may attract public attention should not drive the disclosure analysis; the question is whether the misconduct in question is rightly a matter of public interest, even if the information has not yet been revealed." Ibid.

Given these considerations, the Court held in Rivera that IA records "can and should be disclosed under the common law right of access when interests that favor disclosure outweigh concerns for confidentiality. Id. at 135 (emphasis added). Applying that balancing test, the Court concluded that the factors weighed in favor of releasing the records at issue there, since they involved substantiated allegations of serious misconduct over an extended period of time, by the civilian leader of the police department. Id. at 149-50.

However, the Court also determined in Rivera that the record in that case was "incomplete" and did "not allow for the fact-specific balancing test required under the common law." Id. at 146. Accordingly, the Court remanded for the trial judge in Rivera to review the IA report in camera and complete "a fact-sensitive balancing test" to assess the state's confidentiality interest, determine the scope of information to be released, and make the appropriate redactions. Id. at 147-50.

As for redactions, the Court instructed in Rivera that, "at a minimum" information redacted from the released reports should include:

12

the names of complainants, witnesses, informants, and cooperators, as well as information that could reasonably lead to the discovery of their names; non-public, personal identifying information about officers and others, such as their home addresses and phone numbers; and personal information that would violate a person's reasonable expectation of privacy if disclosed, such as medical information.

[Id. at 150.]

The Court cautioned in Rivera that, more generally, "judges would not be required to review actual internal affairs reports in every case," and "[a] preliminary review of the relevant factors may suffice in individual cases." Id. at 149. The Court further noted that in order to assess the relevant factors, "the parties should present more than generalized, conclusory statements." Ibid. "More detailed objections enable judges to conduct the delicate balancing the common law requires." Ibid.[2]

---

[2] Cases addressing the public right of access to internal affairs records continue to arise. For instance, last year the Supreme Court addressed a common law right of access claim seeking to obtain IA records relating to a police officer who subsequently obtained a criminal records expungement. The Court held that "the expungement statute does not categorically bar the release of IA reports," but it does "bar the release of any information included in an IA report that would reveal an expunged arrest, conviction, or related proceeding." States Newsroom Inc. v. City of Jersey City, 261 N.J. 392, 413 (2025). The expungement issue addressed in States Newsroom is not specifically at issue in this appeal.

In response to the Supreme Court's decision in <u>Rivera</u>, the AG issued a directive and a revised version of the <u>IAPP Manual</u>, with significant edits to Section 9 of the Manual relating to internal affairs reporting and disclosures. <u>See</u> Off. of the Att'y Gen., Law Enf't Directive No. 2022-14, <u>Transparency in Internal Affairs Investigations</u> (Nov. 15, 2022); <u>2022 IAPP Manual</u>. However, the AG expressly stated that "the additional categories of annual disclosure contained in Section I of this Directive apply <u>only prospectively</u> and do not apply to any discipline that has been settled between an officer and law enforcement agency prior to January 1, 2023." Law Enf't Directive No. 2022-14, at 2 (emphasis added).

The following year, in 2023, the Court decided <u>Higgs</u>, 253 N.J. at 333, and addressed the discoverability of IA records under <u>Rule</u> 3:13-3, within the context of a criminal prosecution. We will discuss <u>Higgs</u> in Part II of this opinion <u>infra</u>.

B.

The procedural history and disputed subjects within the present litigation are rather complicated and, as we will discuss, in some respects, confusing.

<u>The Parties</u>

The OPD is a state agency, located within the Executive Branch, Department of the Treasury, but "independent of any supervision or control by the department or by any board or officer thereof." N.J.S.A. 2A:158A-3. The OPD employs criminal defense attorneys who provide representation to indigent clients charged with criminal offenses.

The New Jersey Department of Law and Public Safety ("L&PS"), Division of Criminal Justice ("DCJ"), Office of Public Integrity and Accountability ("OPIA"), is a state office, situated within the Executive Branch and headed by the AG. N.J.S.A. 52:17B-1 and -2. OPIA's Records and Identification Bureau is its custodian of records.

The AG is the State's chief law enforcement officer, N.J.S.A. 52:17B-98; <u>In re Att'y Gen. Directives</u>, 246 N.J. at 482-83, and is responsible for "[f]ormulat[ing] and adopt[ing] rules and regulations for the efficient conduct of the work and general administration of the department, its officers and employees." N.J.S.A. 52:17B-4(d).

<u>The IAPP Manuals</u>

Exercising these responsibilities the AG has published, since 1991, an IAPP Manual in order "to establish standards and policies for the internal affairs

15

review process of the State's law enforcement agencies." In re Att'y Gen. Directives, 246 N.J. at 483. Pursuant to N.J.S.A. 40A:14-181, "[e]very law enforcement agency . . . shall adopt and implement guidelines which shall be consistent with the guidelines governing the" IAPP Manual promulgated by the DCJ.

Although N.J.S.A. 40A:14-181 was passed in 1996, the AG first issued an IAPP Manual five years earlier. Multiple iterations of the IAPP Manual have been issued between 1991 and the current version, issued in 2022.[3]

The 1991 through 2019 versions of the IAPP Manual imposed certain reporting requirements on law enforcement agencies, with summary reporting to county prosecutors starting in 2000, twenty-six years ago. Ultimately, law enforcement agencies were required to produce quarterly summary reports to the relevant law enforcement executives and county prosecutors, and annual summary reports to the public. However, until 2019 these agencies were apparently not required to submit reports to the AG's office. Nor were the summary reports to the county prosecutors subject to standardized forms.

---

[3] The State provided only the 2017 version of the IAPP Manual in its appendix. We obtained and take judicial notice of IAPP Manuals from all other years (1991, 1992, 2000, 2011, 2014, 2019, 2020, 2021, and 2022) from the State Library and the AG's website. Any AG Directives we have referred to herein are available on the AG's website.

A-1041-24

Instead, county prosecutors could create their own reporting forms, although sample forms were sometimes provided; and the required annual summary reports to the public did not include names of the accused officers.

The 2019 Revision of the IAPP Manual

In 2019, the AG revised the IAPP Manual and directed that law enforcement agencies publish their annual summary reports to the public on their websites, and "include[d] a number of new policies to ensure that County Prosecutors exercise appropriate oversight of the Internal Affairs functions of all law enforcement agencies based in their respective counties."  Off. of the Att'y Gen., Law Enf't Directive No. 2019-5, Directive Strengthening & Supplementing Internal Affairs Policy & Procedures (Dec. 4, 2019); 2019 IAPP Manual §§ 9.11 and 10.01 to -.4.

Section 1.0.6 of the revised 2019 IAPP Manual also stated:  "References to County Prosecutors throughout this document should also be understood to refer to the Office of the Attorney General wherever such an interpretation would be appropriate."  This language was continued in subsequent IAPP Manuals.  However, the 2022 IAPP Manual adds a clause to the end of the sentence, as an example of when it would be appropriate to interpret a reference to county prosecutors as a reference to the Office of the AG ("such as when the

Attorney General has superseded the County Prosecutor or the law enforcement agency").

The 2020 IAPP Manual Revision

The 2020 IAPP Manual, at 61-66, continued the requirements for reporting to law enforcement executives, the county prosecutor, and the public, with public reports for the first time including names of officers, but only for incidents of "major discipline," "where a termination, reduction in rank or grade, and/or suspension more than five days was assessed." The 2020 IAPP Manual also introduced the "Appendix K" reports at issue in the present litigation. The Manual mandated that every law enforcement agency utilize the Appendix K form when filing their quarterly reports with their county prosecutors. Id. at 62-63. However, the county prosecutors were permitted to establish the specific reporting schedule. Id. at 62.

Of pertinence here, the 2020 IAPP Manual also, for the first time, mandated that county prosecutors also file reports with the AG's Office. Specifically, Section 9.11.1 of the 2020 IAPP Manual required county prosecutors to submit "a summary of the reports from all agencies in its jurisdiction to the [OPIA]," and specified that "[t]he Annual Internal Affairs

18

Summary attached to Appendix K may be used to satisfy the requirements of this Section." (Emphasis added).

Ensuing Developments

Litigation delayed implementation of the 2020 changes. Thus, in presenting the 2021 IAPP Manual, the AG explained that as a result of an extended stay of "the Major Discipline Directive[4]" law enforcement agencies had been prevented from producing their initial reports of major discipline. Therefore, the AG extended the time for law enforcement agencies to issue their first public reports to August 9, 2021, with the reports to address discipline post-dating the date of the Major Discipline Directive (June 15, 2020), through December 31, 2020.[5]

Section 9.11.1 of the 2021 IAPP Manual continued the requirement that county prosecutors submit to the OPIA a summary of reports they received from all law enforcement agencies within their jurisdictions. Section 9.11.2 of the 2021 IAPP Manual added a requirement that law enforcement agencies produce their annual summary major discipline reports to the AG, as well as to county

_____

[4]   See Off. of the Att'y Gen., Law Enf't Directive No. 2020-5, Directive Requiring Public Disclosure of the Identities of Officers Who Commit Serious Disciplinary Violations (June 15, 2020).

[5]   See Law Enf't Directive No. 2021-6.

prosecutors and the public, no later than January 31 of the following year, and required that they use the report form included at Appendix L.

The 2022 (Present) IAPP Manual

In 2022, the AG introduced another revised IAPP Manual, in response to the Supreme Court's decision in Rivera, 250 N.J. at 124.[6]  Among other things, the current 2022 IAPP Manual includes the following recordkeeping and data reporting requirements[7]:

Recordkeeping & Data Reporting

(k) Pursuant to AG Directive 2018-3, each agency shall establish an "early warning" protocol for monitoring and tracking the conduct of all officers.

(l) Each agency must establish and maintain an internal affairs records system which, at a minimum, will consist of an internal affairs index system and a filing system for all documents and records.

(m) On a quarterly basis, each agency shall submit to the County Prosecutor a report summarizing the allegations received and the investigations concluded for that period.  The Attorney General shall establish a schedule for the submission of the reports.

---

[6]  See Off. of the Att'y Gen., Law Enf't Directive No. 2022-14, Transparency in Internal Affairs Investigations (Nov. 15, 2022).

[7]  We present various portions of the 2022 IAPP Manual for sake of completeness, mindful that many readers of this opinion will have little interest to pore through the technical verbiage.

A-1041-24

(n) On an annual basis, each agency shall publish on its public website a report to the public summarizing the allegations received and the investigations concluded for that period. These reports shall not contain the identities of officers or complainants.

(o) On a periodic basis, and at least once a year, each agency shall submit to the County Prosecutor and publish on the agency's public website a brief synopsis of all complaints where a fine or suspension of 10 days or more was assessed to an agency member. The synopsis shall not contain the identities of the officers or complainants.

[2022 IAPP Manual, § 1.0.9 (emphasis added).]

These recordkeeping and data reporting requirements are expounded upon in Section 9 of the 2022 IAPP Manual. With respect to public disclosure of IA records, Section 9.6 of the 2022 IAPP Manual provides that IA records are confidential, but allows for some limited disclosures. At Section 9.6.1, it states:

The nature and source of internal allegations, the progress of internal affairs investigations, and the resulting materials are confidential information and remain exempt from access under [OPRA], N.J.S.A. 47:1A-1.1 to -13. The contents of an internal investigation case file, including the original complaint, shall be retained in the internal affairs function and clearly marked as confidential. The information and records of an internal investigation shall only be released or shared under the following limited circumstances:

(a) If administrative charges have been brought against an officer and a hearing will be held, a copy of all

21

discoverable materials shall be provided to the officer and the hearing officer before the hearing;

(b) If the subject officer, agency or governing jurisdiction has been named as a defendant in a lawsuit arising out of the specific incident covered by an internal investigation, a copy of the internal investigative reports may be released to the attorney representing the subject officer, agency or jurisdiction;

(c) Upon the request or at the direction of the County Prosecutor or Attorney General;

(d) Upon a court order; or

(e) Upon a request from the Division of Pensions, following an officer's application for a retirement allowance.

[(Emphasis added).]

In addition, at Section 9.6.2(a), the 2022 IAPP Manual authorizes the release of "[t]he Summary and Conclusions Report described in Section 9.1.1(b) . . . in response to a request made under the common law right of access by any member of the public or press," but only "where it satisfies any of the following conditions":

(1) The Summary and Conclusions Report led to a result on or after January 1, 2023, that requires disclosure pursuant to Section 9.11.2;

(2) The agency otherwise concludes that the Summary and Conclusions Report is subject to release pursuant to applicable law or court order; or

22

(3) Upon the request or at the direction of the County Prosecutor or Attorney General at any time.

Redactions Under IAPP Section 9.6.2(b)

Section 9.6.2(b) provides for the redaction of information from any report that is subject to disclosure under subpart (a), as follows:

(b) When an agency concludes that a report is subject to disclosure under Section 9.6.2(a), <u>it shall redact the following before disclosure</u>:

(1) The names of complainants, witnesses, informants, victims and cooperators, in addition to information that could reasonably lead to discovery of their identities;[]

(2) Non-public, personal identifying information about any individual named in the report, such as their home addresses, phone numbers, dates of birth, social security numbers, familial relationships, etc.;

(3) Medical information or history, including but not limited to, mental health or substance abuse services and drug or alcohol evaluation, counseling or treatment;

(4) Information regarding any criminal investigation or prosecution that is not already contained in a public filing, or any information that would impede or interfere with a pending criminal or disciplinary proceeding;

(5) Any records or material prohibited from disclosure by law;

(6) Juvenile records;

A-1041-24

(7) Any information which is the subject of a judicial order compelling confidentiality;

(8) Any other information that would violate a person's reasonable expectation of privacy; and

(9) Any information regarding law enforcement personnel, procedures, or resources that could create a risk to the safety of any person, including but not limited to law enforcement personnel.

[(Emphasis added).]

At Section 9.10, the 2022 IAPP Manual addresses reports that law enforcement agencies must make to their county prosecutors, including the Appendix K records sought by plaintiff. Specifically, Sections 9.10.1 and 9.10.2 provide:

9.10.1 On a quarterly basis, every law enforcement agency shall report internal affairs activity to the County Prosecutor on an internal affairs summary report form attached as Appendix K (The fillable form may be found on the Attorney General's website). Each County Prosecutor will provide those law enforcement agencies—including municipal police departments—in their jurisdiction with instructions on completing the forms, and a reporting schedule.

9.10.2 The summary report forms must contain sufficient information to enable the County Prosecutor to identify warning signs of potential deficiencies in the internal affairs process. At a minimum, each report must include a brief summary of each internal affairs complaint that was pending before the agency at any point during the reporting period. The summary shall

A-1041-24

at least include the nature of the complaint, the date the complaint was received, the current status of the complaint, and, if the case is closed, the final disposition of the complaint with any discipline imposed. A sample form is found at Appendix K.

[(Emphasis added).]

In Section 9.10.3, the 2022 IAPP Manual addresses the need for law enforcement agencies to report to county prosecutors all information relating to an officer's credibility, and lists specific types of incidents and findings that must be reported (e.g., "[a] finding that a police officer filed a false report or submitted a false certification in any criminal, administrative, employment, financial or insurance matter in their professional or personal life."). However, at Section 9.10.4, the 2022 IAPP Manual states:

That law enforcement agencies report the above-listed incidents to the County Prosecutor's Office does not constitute a mandate or requirement that the information be disclosed to the court. Prosecutors should conduct an independent review of the information provided to determine whether it needs to be disclosed and whether the officer can participate in the prosecution of criminal cases.

Section 9.11 of the 2022 IAPP Manual addresses public reports of IA affairs data, with oversight provided by the AG's office. Section 9.11.1 provides:

A-1041-24

On an annual basis, every law enforcement agency shall provide to the County Prosecutor and publish on its public website a report summarizing the types of complaints received and the dispositions of those complaints. This report should be statistical in nature. The County Prosecutor shall submit a summary of the reports from all agencies in its jurisdiction to the Office of Public Integrity and Accountability. The Annual Internal Affairs Summary attached to Appendix K shall be used to satisfy the requirements of this Section. This process shall be overseen and directed by the Attorney General's Office of Public Integrity & Accountability and the Office of Justice Data.

[(Emphasis added).]

Further, Section 9.11.2 requires the "periodic" production of reports to both the county prosecutor and the AG, providing:

On a periodic basis, and no later than January 31 of the following year, every agency shall submit to the County Prosecutor and the Attorney General, and publish on the agency's public website, a brief synopsis of all misconduct where an agency member:

(a) Was terminated;
f
(b) Was reduced in rank or grade;

(c) Was assessed a suspension of more than five days . . .;

(d) Had a sustained finding of discrimination or bias against any person because of the individual's actual or perceived race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation,

26

genetic information, sex, gender identity or expression, disability, nationality, familial status, or any other protected characteristic under N.J.S.A. 10:5-1 [to -49], regardless of the type or severity of discipline imposed;

(e) Had a sustained finding that the officer utilized excessive force in violation of departmental policy or the Attorney General's Use of Force Policy, regardless of the type or severity of discipline imposed;

(f) Had a sustained finding that the officer was untruthful or has demonstrated a lack of candor, regardless of the type or severity of discipline imposed;

(g) Had a sustained finding that an officer has filed a false report or submitted a false certification in any criminal, administrative, employment, financial, or insurance matter in their professional or personal life, regardless of the type or severity of discipline imposed;

(h) Had a sustained finding that an officer intentionally conducted an improper search, seizure or arrest, regardless of the type or severity of discipline imposed;

(i) Had a sustained finding that an officer intentionally mishandled or destroyed evidence, regardless of the type or severity of discipline imposed;

(j) Had a sustained finding of domestic violence, as defined in N.J.S.A. 2C:25-19, regardless of the type or severity of discipline imposed;

(k) Resigned, retired, transferred or separated from the agency, regardless of the reason, while any internal affairs investigation or complaint was pending, and the misconduct ultimately sustained falls within categories (d) through (j) above or would have resulted in an

27

action under categories (a) through (c) had the member not separated from the agency;[] or

(l) Was charged with any indictable crime under New Jersey or an equivalent offense under federal law or the law of another jurisdiction related to the complaint.

. . . .

The reporting and public dissemination requirements of (a) through (j) above become applicable once an officer's discipline is sustained, as defined above.  The reporting and public dissemination requirements of (k) and (l) above become applicable at the close of the reporting period during which they occur.

The synopsis of each case, required by this section, shall follow the format provided in Appendix L and shall include the identity of each officer subject to final discipline, a full explanation of the rule, regulation, policy, directive, or law violated, a factual summary of their conduct, and a statement of the sanction imposed. The synopsis shall provide sufficient detail to enable a reader who is not familiar with the case to fully understand the factual scenario that resulted in the disciplinary action.  Examples of acceptable synopses may be found in Appendix L (updated November 2022).  This synopsis shall not contain the identities of the complainants or any victims.  Where discipline relates to domestic violence, the synopsis shall not disclose the relationship between a victim and an officer.  In rare circumstances, further redactions may be necessary to protect the identity of a victim. Whenever practicable, notice shall be given to victims of domestic or sexual violence in advance of an agency's disclosure of discipline related to the incident.

> The required posting to the agency's public website shall remain in place and publicly accessible.

[(Emphasis added) (footnote omitted).]

Appendix K

Appendix K—the critical document sought by the OPD in this case--"is an Internal Affairs reporting document used by local law enforcement to report compliance to county prosecutor's offices." The form document contains multiple tabs, only one of which, titled "'Annual Summary' . . . is intended for public disclosure," as discussed in Section 9.11.1 of the 2022 IAPP Manual. The remaining tabs, including the "Cases Pending" and "Cases Opened" tabs, "are intended for internal use only and contain confidential information including the nature and source of internal allegations, the progress and status of internal affairs investigations, the names of all agency members involved, and the outcomes of such allegations for the respective reporting period."

The Cases Pending and Cases Opened tabs in Appendix K "disclose the nature and source of internal allegations, the progress of internal affairs investigations, the resulting information, and the names of all officers involved." They also "identify pending and unsubstantiated complaints, including those that the target officer may be unaware of," such that, according to the AG, "[d]isclosure of these records creates a significant risk of compromising internal

29

affairs or related criminal investigations," and "identifying officers and providing information that could reveal complainants will likely chill the internal affairs process."

The ECPO's Inadvertent Posting in November 2022

In November 2022, the OPD discovered that the ECPO had published a complete Appendix K document on its website. The document "listed complete index information regarding Internal Affairs cases resolved or pending during 2021." The posted document included: the police department where the officer at issue worked; the IA case number; the date the complaint was received; the officer's name; the officer's race; the source of the complaint (civilian or agency); the complainant's race; the complaint allegation (e.g., crime, excessive force, improper arrest, demeanor, etc.); the date the case was suspended; the reason for suspension; the date the case was resumed from suspension; the date the case was closed; the length of the case; the status of the case (pending, closed, etc.); whether there was a criminal disposition; the internal disposition (sustained, not sustained, exonerated, etc.); and any discipline imposed.[8] "The

---

[8] The 2022 IAPP Manual requires law enforcement agencies to identify "general categories of misconduct or inappropriate behavior that are subject to disciplinary action," such as "crime," "excessive force," as well as "uniform

30

information contained within this Appendix K was not publicly available elsewhere and had not been disclosed in the regular course of discovery to the OPD attorneys at any point."

The ECPO explained that during a transition to a new website, it had inadvertently published the entire 2021 Appendix K document, including the Cases Pending and Cases Opened tabs, rather than just the Annual Summary tab. However, the ECPO removed the confidential records from its website upon becoming aware of the inadvertent public posting, and it also requested removal of the 2021 Appendix K from "the Wayback Machine, an internet-based website archive database." The ECPO[9] asserted "[t]he posting of Appendix K was neither intentional nor a policy decision," and "[a]ll public postings of Appendix K have been removed from ECPO's website."

The OPD's Access Requests

On December 9, 2023, plaintiff filed an OPRA request with defendant, seeking production of "all reports entitled 'Internal Affairs Case Reporting: County Summary' submitted by the [ECPO] to the [AG's] Office or to the

_____

classification of the resolution of complaints," such as "sustained," "unfounded," "exonerated," etc. See 2022 IAPP Manual §§ 2.2.2 to .3.

[9] The ECPO is not a party to this case.

[OPIA] between January 1, 2013, and the present" (i.e., the Appendix K documents that county prosecutors are required to file on an annual basis under Section 9.11 of the 2022 IAPP Manual).

The OPD asserts that information contained in Appendix K submissions implicates its obligation to provide effective assistance of counsel to indigent clients at every stage of criminal proceedings, including discovery, defense investigation, plea negotiations, motion practice, and trial. The OPD also provides specific examples of how it used Appendix K information obtained from the ECPO's website. Those uses include situations in which the officers involved in an arrest were the subject of pending IA cases, or previously had sustained IA charges, and the State had not provided that information in discovery pursuant to its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972).

Defendants did not produce the documents the OPD requested. Instead, on February 9, 2024, they responded to the OPD's OPRA request by producing "publicly available statistical information of Internal Affairs cases." That is, the AG "produced all annual summaries submitted by the ECPO from 2013 to present." (Emphasis added).

32

The OPD acknowledged receipt of these records, but maintained that they were not fully responsive to its request. After communicating with the OPIA, the OPD reiterated its request for complete Appendix K documentation, including information provided under the Cases Pending and Cases Opened tabs, such as officer names, internal affairs case numbers, and case dispositions. However, the OPD narrowed the timeframe of the request from 2021 to the present date "based on the representation that such county summaries were not collected by the Attorney General prior to 2021." The OPD asserts that "such information is necessary [for] identifying officers with histories of misconduct that are relevant to pending criminal cases against the OPD's clients."

On April 3, 2024, defendants denied the request, stating:

> The [OPIA] is denying your narrowed request for "the County Summary from 2021 through the present for those reports submitted by [ECPO]." Please be advised that all records provided to you on February 9, 2024 (and attached again for reference) remain those that are responsive to your request.
>
> Please be advised that, to the extent your request seeks specific internal affairs matters, including the names of officers involved, N.J.S.A. 47:1A-9(b) exempts from access any records recognized to be confidential by statute. Because N.J.S.A. 40A:14-181 directs all law enforcement agencies to "adopt and implement guidelines which shall be consistent" with the Attorney General's [IAPP], and "[t]he nature and source of internal allegations, the progress of internal affairs

33

investigations, and the resulting materials are confidential information and remain exempt from access under [OPRA], see IAPP § 9.6.1 (Nov. 2022), any such records may not be disclosed under OPRA. See also Rivera v. Union Cnty. Pros. Office, 250 N.J. 124, 142-43 (2022) (recognizing the confidentiality of internal affairs records under the IAPP and N.J.S.A. 47:1A-9).

Furthermore, to the extent that you are seeking information that has since been removed from other agencies' websites, please be advised that this information is not subject to release under OPRA. Pursuant to the IAPP, the report you are seeking is "considered a confidential, internal work product." IAPP 9.9.3. Only the summary report (as contained within Appendix K), which does not contain officer names and is "statistical in nature" and "summarizes the types of complaints received and the disposition of complaints" may be released publicly. IAPP 9.11.1.

The Office reserves the right to claim additional grounds for denial not raised in this response. This request is considered closed at this time.

The OPD acknowledged defendants' response and expressed its understanding that its request had been denied on both OPRA and common law grounds.

This Lawsuit

The present litigation ensued in the Law Division, with the OPD arguing that it has a common law right of access to the Appendix K documents. The

34

OPD alleges: "There is a compelling public interest in information summarizing efforts to hold police officers accountable, deter official misconduct, assess whether the internal affairs process is working properly, and foster trust in our system of law enforcement." It further alleges the OPD

> has a significant interest in accessing such summary information contained within Appendix K submissions from the [ECPO] in order to provide effective assistance of counsel by accurately assessing the strength of criminal cases against its clients, evaluating the credibility of police witnesses against its clients, and determining the State's compliance with discovery obligations to its clients.

The AG moved to dismiss the complaint, arguing that no court-ordered disclosure of Appendix K information was warranted. The OPD opposed the motion, and the trial court entertained oral argument.

The Trial Court's Rulings

In dismissing the OPD's complaint, the trial court found that the OPD was not entitled to the Appendix K submissions, either as a matter of criminal discovery under Higgs, 253 N.J. at 333, or under the common law right of access, Rivera, 250 N.J. at 124.

First, the court read the complaint as the OPD "seeking Appendix K materials on behalf of the clients it represents." With this presumption, the court found that "the instant action is not the proper vehicle for [p]laintiff to seek such

35

materials," since the Supreme Court addressed the discoverability of internal affairs materials in <u>Higgs</u>, and the complaint appeared more akin to a "fishing expedition" than a request for a specific category of information relevant to a particular case.

Next, the court gave the complaint a more indulgent reading, and construed the OPD's request as based in "a 'wholesome public interest.'" However, even under that construction, the court found that "Plaintiff's right to access the information does not outweigh the State's interest in preventing disclosures," applying the factors set forth in <u>Rivera</u>, 250 N.J. at 124, and <u>Loigman</u>, 102 N.J. at 98. In particular, the court noted the breadth of information contained in the Appendix K reports, which included allegations of minor forms of misconduct, unsubstantiated allegations of misconduct, and allegations that were currently under investigation, as well as information about the source and date of the complaint and the ethnicity of the complainant, which could lead to an ability to identify the complainant.

The court concluded:

> The <u>Loigman</u> and <u>Rivera</u> factors weigh heavily in favor of non-disclosure of Appendix K under the common law right of access. The Court is particularly concerned that disclosure of Appendix K will result in the release of ongoing internal affairs investigations, have a

A-1041-24

chilling effect on witnesses and victims, and impair the internal affairs process.

Accordingly, the Court denies Plaintiff's application for an order to show cause and dismisses Plaintiff's complaint with prejudice.

<u>Reconsideration and Redaction Denied</u>

The OPD moved for reconsideration. In denying the OPD's motion for reconsideration, the trial court noted that the OPD was now requesting <u>redacted</u> Appendix K reports, or the use of a protective order or other measures to address privacy and related concerns. However, the court observed that "the Plaintiff [initially] did not ask or request that Defendants provide it redacted records." And "[t]hat the Court did not compel Defendants to do something that Plaintiff did not request does not seem to be the [appropriate in the context] of a reconsideration motion."

The court went on to state a key premise – asserted by the AG – about what information is already "publicly available":

> That aside, Plaintiff's redactions would limit Appendix K to just serious, substantiated misconduct, with nothing about complainant's identities. Plaintiff asserts that these redactions would favor disclosure under <u>Rivera</u> and <u>Loigman</u>. While redactions may affect the <u>Rivera</u> and <u>Loigman</u> factors, <u>Defendants point out that Plaintiff[] ha[s] access to the limited information it seeks. Defendants provide publicly available information about officers who incurred major</u>

37

> discipline and general summaries of sustained misconduct.  Plaintiff's revisions then have no real effect.  Thus, the redactions have no real effect.  Thus, the redactions have no significance on the matter.
>
> Because Plaintiff failed to show the Court's decision was palpably incorrect, or the Court did not consider, or failed to consider, competent evidence, the Court declines to reconsider its September 2024 Order.

[(Emphasis added).]

This Appeal

The OPD has appealed, joined by the amicus curiae.  Among other things, the OPD argues the trial court misapplied the common law balance in the State's favor in denying its access request in full, and at the very least should have ordered the release of redacted records.  The OPD further contends the court erred in deeming Higgs a barrier to disclosure.

II.

Our main focus in this opinion is to address the impact of Higgs on the OPD's disclosure request.  For the reasons that follow, we respectfully conclude the trial court erred in treating Higgs as an impediment to the OPD's common law claim for access.

Higgs concerned the appeal of a murder conviction.  The indictment arose out of an exchange of gunfire between the defendant and a police officer who

had been investigating a front-porch argument between the defendant and a woman. 253 N.J. at 340. A bullet from the defendant's gun struck and killed the woman. Id. at 341. Prior to trial, defense counsel sought copies of the officer's IA records in discovery, particularly looking for the officer's previous involvement in on-duty shootings. Id. at 346. After conducting an in camera review of the officer's IA file, the trial court concluded it contained nothing that should have been turned over to the defendant. Ibid. On appeal, we affirmed the defendant's conviction without commenting on the discovery denial. Id. at 350.

The Supreme Court in Higgs reversed the defendant's conviction on several grounds. Of significance here, the Court ruled that the trial court erred in denying defense counsel access to the portions of the IA file documenting his involvement in previous on-duty shootings. Id. at 360. In addressing that discovery issue, the Court provided detailed guidance about the standards and procedures to be followed in the future for similar criminal discovery requests.

Specifically, the Court in Higgs directed as follows:

> Going forward, a defendant who seeks discovery of information from an internal affairs file must first file a motion with the trial court requesting an in camera review of that file. The motion shall identify the specific category of information the defendant seeks and the relevance of that information to the defendant's

case. A general allegation that the defendant is in search of information relevant to a law enforcement officer's credibility for impeachment purposes would be insufficient to obtain review of the file. The procedure should not be a fishing expedition into the disciplinary records of law enforcement.

An allegation that the information, if present, is relevant to the case is necessary for a defendant to obtain the trial court's in camera review of the file. . . .

We anticipate that many defendants will be in a position to meet the relevancy standard. . . . At a time when the Attorney General's Directives have signaled a massive shift in policy regarding the confidentiality of internal affairs records and this Court has held that the general public, under certain circumstances, can obtain internal affairs files through the common law right of access, there is no logical reason why criminal defendants, whose life and liberty are at stake, should have less access to those records than the general public.

[Id. at 358-59 (emphasis added).]

If a defendant presents a relevant need for the IA records, the Court prescribed

the following procedures in Higgs:

If the trial court determines as a threshold matter that the requested information, if present in the internal affairs file, would be relevant to the defendant's case -- for impeachment purposes or to support the defense's theory, for example -- the trial court shall grant the defendant's motion and conduct an in camera review of the internal affairs records outside the presence of the parties. The in camera review by the trial court would be solely for the purpose of determining whether the

> category of identified information exists in the internal affairs file.
>
> [Id. at 360 (emphasis added).]

The Court then specified the steps to be taken if relevant information was identified in the in camera review:

> If, upon review, the trial court determines that the requested information is present in the file, both parties shall be allowed to review the relevant portion of the file, subject to any protective orders entered by the trial court.
>
> Allowing the parties access to the relevant portion of the internal affairs file is not, however, the end of the inquiry. Even if the evidence sought is present in the file and relevant to the case, the court must balance its relevance against potential undue prejudice, as required in N.J.R.E. 403, prior to allowing that evidence in at trial.
>
> [Id. at 359-60 (emphasis added.]

Higgs is not directly applicable to the present litigation, because it involved a question of discovery in the context of a case-specific criminal prosecution rather than a request for documents under the common law right of access. Claims for access under the common law must be considered instead under the standard set forth in Rivera.

This litigation presents an interplay between Rivera and Higgs. The OPD is a unique litigant because it serves as counsel to many criminal defendants in

41

this State. Indeed, as the trial court recognized, the legitimate interests the OPD expresses in its complaint, in support of its common law right of access to Appendix K reports, largely relate to its institutional role in representing criminal defendants.

Beyond that role in representing clients on a case-by-case basis, we recognize the OPD also has an important institutional role in voicing positions relating to criminal justice policies. By having access to IA reports, the OPD is in a more informed position to participate in that public discourse relating to the training, supervision, and discipline of law enforcement personnel.

It is apparent that the IA information obtainable in criminal discovery is not identical to the IA information that can be learned from accessing sources such as Appendix K. Some information could be obtainable through the criminal discovery process under Higgs that is not reflected in Appendix K reports. On the other hand, Appendix K reports might reveal certain information that would not necessarily be disclosed in discovery under the Higgs procedures. The two methods of information-gathering may function in tandem and be complementary.

We agree with the OPD that it can have no less rights to Appendix K and IA information than are enjoyed by the public at large and requestors such as

42

the amicus organization in this appeal. Indeed, the AG has not identified what would prevent amicus or other requestors from sharing with the OPD the IA information they may obtain under the common law. There is no practical reason to preclude the OPD from having equivalent common law access.

For these reasons, we conclude the trial court erred in relying upon Higgs as a justification for denying the OPD's access claims. That error manifestly affected the court's analysis and balancing of interests. Accordingly, the trial court erred to the extent it denied the OPD access to Appendix K documents based, even in part, upon Higgs.

We conclude that the court's decision therefore must be vacated, without prejudice, and remanded for fresh consideration of the Rivera factors without reliance on Higgs. As part of that remand, the trial court shall conduct an in camera review of the records in question, and determine what, if any, redactions may be warranted. See Rivera, 250 N.J. at 150; 2022 IAPP at Section 9.6.2(b). The court's blanket denial of redaction on the OPD's motion for reconsideration must be examined anew. We recognize the OPD should have specified the remedy of partial disclosure, with redactions, sooner. Nonetheless, the interests of justice warrant the trial court's fulsome consideration of redaction.

## III.

As part of the remand, we further ask the trial court to resolve certain factual aspects of the parties' dispute that appear confusing and perhaps are the sources of misunderstanding and miscommunication.

We note that at this point the OPD has limited its request to Appendix K reports for Essex County from 2021 to the present, redacted to show only officers with "sustained major discipline," for which there is no appeal pending, or the time for appeal has expired.[10]

However, it is uncertain to us whether the OPD and the AG are using the same concepts of "major discipline." The OPD appears to be defining "major discipline" broadly as (1) all of the disciplinary actions which are deemed subject to disclosure both under the regulatory definition of "major discipline," N.J.A.C. 4A:2-2.2(a), utilized in the IAPP Manual since 2020, which is discipline that resulted in a termination, reduction in rank or grade, and/or suspension of more than five days; plus (2) the category of "serious misconduct" that the Supreme Court found subject to common law disclosure in Rivera, 250 at 148 (which may be termed "Rivera-misconduct"), which includes "the use of

---

[10]   Therefore, the trial court will not have to consider issues relating to any reports that were required before the Appendix K reports.

excessive or deadly force, discrimination or bias, domestic or sexual violence, concealment or fabrication of evidence or reports, criminal behavior, or abuse of the public trust."

By contrast, the AG appears to be using solely the definition of "major discipline" in N.J.A.C. 4A:2-2.2(a) and not also the "Rivera-misconduct" items. However, this is not entirely clear.

During oral argument on the appeal, defendant's counsel referred to an on-line source described as the "the major discipline portal." It is not clear exactly what information that portal contains, and to what extent it may omit information that the OPD regards as within its broader conception of "major discipline."

As we noted above in Part II, the trial court accepted the AG's contention that redacted Appendix K reports would be "entirely duplicative" of publicly available information released by defendant. However, that alleged exact duplication appears to be disputed.

Given the persisting factual disputes and the unclear terminology, the trial court should clarify the matter and make findings on remand that include the following:

(1) an explanation of "the major discipline portal" delineating what it is, what is disclosed through the portal and on what reporting schedule, and what entity manages the portal;

(2) a more complete explanation of the Appendix K reports – what entity/entities produce them, to whom they produce them and on what schedule, and what data they contain; and

(3) whether the information released through the "major discipline portal" is in any way different than the information on "sustained major discipline" contained in the Appendix K reports;

(4) depending on the court's factual findings, the court must then reconsider whether the Appendix K reports should be disclosed, subject to redactions, under the common law balancing test.

Additionally, the trial court is asked to resolve on remand whether the OPD is entitled to receive only annual Appendix K report information, or whether quarterly reports are actually in the AG's possession and, if so, the OPD is also entitled to their disclosure, with redactions. The record in this respect unfortunately is also unclear.

46

Beyond these points, we decline to address any other issues raised, pending the remand. The trial court shall conduct a case management conference within thirty days to plan steps to effectuate the remand.

Vacated in part and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division